STATE of Wisconsin, Plaintiff-Respondent,

v.

Peter J. CHAPMAN, Defendant-Appellant.†

Court of Appeals

*No. 92–1148–CR. Oral argument December 8, 1992.—Decided March 10, 1993.*

(Also reported in 499 N.W.2d 222.)

†Petition to review denied.

On behalf of the defendant-appellant, there were briefs and oral argument by *William E. Schmaal,* of Madison.

On behalf of the plaintiff-respondent, there was a brief by *James E. Doyle,* attorney general and *David J. Becker,* assistant attorney general. There was oral argument by *David J. Becker.*

Before Brown, Anderson and Snyder, JJ.

ANDERSON, J.  Peter J. Chapman raises two issues in this appeal from his conviction for first-degree intentional homicide. First, he maintains that the trial court erred in not submitting the instruction on the lesser included offense of second-degree reckless homicide. We conclude that the trial court did not err because a reasonable view of and fair inferences drawn from the evidence would not support a conviction of second-degree reckless homicide. Second, Chapman claims that he has been denied a constitutional right to presentence confinement credit. We are satisfied that there is a rational basis for denying credit for presentence confinement to individuals convicted of crimes with a penalty of

mandatory life imprisonment and that Chapman was not improperly denied credit for the time he spent in jail before his sentencing. Therefore, we affirm the judgment of conviction and the order denying postconviction relief.

On the morning of June 24, 1990, Peter J. Chapman reported the abduction of his eleven-month-old son Michael from his automobile. Chapman suggested to Milwaukee police that Michael's mother, Gina Godlweski, could be a suspect because she and Chapman had just begun a custody battle for Michael. Immediate investigation proved fruitless and Chapman voluntarily accompanied officers to police headquarters.

Police reinterviewed Chapman later that afternoon when it became apparent that Chapman's various statements were inconsistent concerning the time at which he left home that morning. Police asked Chapman if Michael was in heaven, to which Chapman replied "no," but he knew that Michael was "safe and alright." Police placed Chapman under arrest that evening.

At about 2:30 a.m. the next day, Chapman remarked to officers that there was no need to worry, that Michael was okay and the police need not keep looking for him. He was reinterviewed at about 10:00 a.m. and on this occasion he broke down and began sobbing. He said he had awakened at approximately 5:00 a.m. on June 24 and found Michael cold and motionless in his crib, apparently not breathing. He stated that he had covered Michael with a flannel shirt, but that Michael appeared to be dead. He said he was confused and had not known what to do, so he put Michael in his car and drove around for awhile. He eventually buried Michael in a wooded area because he feared that he might be accused of having killed his son.

He accompanied officers to the burial site and during the trip he asked them whether they were going to "cut Michael up" and stated that "accidents like this shouldn't happen to a perfectly healthy baby." Police officers dug out a shallow grave and found Michael's body.

On the third morning of Chapman's custody, he told the jailer that "I just want to know whether my son is dead or alive." Later that morning, Chapman asked whether Michael was dead or alive when they found him, explaining that, "I have heard of things like that happening, people look like they are dead, but they're not."

The primary issue at trial was whether Michael was alive when Chapman buried him. Two forensic pathologists testified for the state. The Deputy Chief Medical Examiner for Milwaukee County testified about the autopsy results. The autopsy disclosed dirt material on the inner surfaces of the child's clenched fists and under his fingernails. The medical examiner found dirt packed within both nostrils and the mouth. He also found dirt on the walls of the larynx and trachea and on top of the contents of the stomach. The medical examiner testified, to a reasonable degree of medical certainty, that the dirt in the stomach and in the airway could only have gotten there if it had been swallowed while the victim was alive. Based upon the autopsy findings, the medical examiner's conclusion was that the victim died of mechanical asphyxia associated with being in the grave while alive.

The second expert witness presented by the state was a pediatric forensic pathologist. This pathologist reviewed the state's autopsy report, an autopsy report prepared by Chapman's pathologist, photographs and other documentation. It was the opinion of this expert that the victim died of asphyxia from having been placed in the ground and covered with dirt.

Chapman presented the testimony of the Chief Medical Examiner for the State of Maryland who had conducted an independent autopsy. The defense expert opined that it was his opinion that the victim was not alive at the time he was buried. The expert further testified that he did not have enough information to arrive at a clearcut diagnosis of the cause of death.

Although Chapman did not testify, an officer testified as to the statements Chapman made to the investigating officers while he was in custody. Based on the testimony, the state contends that only two possible conclusions were supported by the evidence: either the child was dead and Chapman did not intend to kill him; or the child was alive when he was buried and Chapman intended the burial to cause death. In other words, if Chapman did not commit first-degree intentional homicide, then he committed no crime at all.

During the jury instruction conference Chapman's counsel requested that the trial court submit the lesser included offense instruction for second-degree reckless homicide as defined in sec. 940.06, Stats. *See* Wis J I—Criminal 1060. Counsel argued that a third possible version of the facts supported this instruction. He stated:

> The third version of the facts is that Peter Chapman caused the death of this child, but that he did not do so intentionally, in other words, essentially adopting—the jury essentially adopting as true the statements that Peter made concerning the death of this child, and that he found this child dead, that he—or at least appearing dead, that in his own belief that the child was dead, and that subsequently after some period of time he buried the child.
>
> I don't think that [utter disregard for human life] could be concluded simply of the passage of time

alone; however I do think it might be reason for a jury to conclude that by not taking this baby to a doctor, not calling an ambulance, something like that, and simply burying the child without having any kind of medical expert conclude that this child is dead could rise to reckless conduct, and that he would be, at least a reasonable person would be, aware that such conduct would be reckless, that it would cause a substantial possibility of causing death.

Thus, Chapman contended that an adult parent's decision to perform an informal burial of an infant who appears to be dead, without seeking medical verification of death, is circumstantial evidence of the parent's recklessness in the absence of unusual circumstances. The trial court denied the request, ruling that no evidence existed showing Chapman's *awareness* of the unreasonable and substantial risk of death his conduct might create.

The jury found Chapman guilty of first-degree intentional homicide. *See* sec. 940.01, Stats. The trial court sentenced Chapman to a mandatory term of life imprisonment and fixed his parole eligibility date at April 22, 2021. The trial court declined to grant Chapman 301 days of sentence credit against his parole eligibility date.

Chapman filed a motion for postconviction relief requesting a new trial. First, he asserted that the trial court erred in refusing to submit a lesser included instruction for first-degree intentional homicide. He also challenged the parole eligibility portion of his sentence as being unconstitutional. Finally, he contended that the trial court's unwillingness to grant his presentence credit violated his constitutional and statutory rights to receive credit against his parole eligibility date. The trial court denied Chapman's motion for postconviction relief.

On appeal Chapman has abandoned his constitutional challenge to the parole eligibility portion of his sentence. He raises two issues in this appeal. First, he contends that the trial court erred in denying his request for a lesser included offense instruction. He argues that there was a reasonable basis to acquit him of first-degree intentional homicide because there was no direct evidence of the causal mechanism of Michael's death. In addition, there was no evidence that he had intended to kill Michael. Chapman argues that the evidence, consisting of his statements to the police, showed that he believed Michael was dead before he buried his son. Chapman continues that the direct evidence and reasonable inferences justified an instruction on second-degree reckless homicide. He contends that the evidence supports a view that he was actually and subjectively aware of the fact that burying Michael without seeking medical assistance created an unreasonable risk of contributing to the child's death and that he was willing to expose Michael to that risk.

Chapman's argument on the second issue focuses on the trial court's rejection of his request to credit presentence confinement of 301 days against his parole eligibility date of April 22, 2021. In denying his request the trial court observed that it had taken this time into consideration when it set the specific parole eligibility date. Chapman asserts that the court must apply this credit after establishing his parole eligibility date. He maintains that the trial court's actions violated the protections afforded by due process and equal protection provisions of the federal and state constitutions.

The general principle is that every degree of homicide is a lesser included offense of first-degree intentional homicide. *See* Dickey, Schultz & Fullin, *The Importance of Clarity in the Law of Homicide: The Wisconsin Revision*, 1989 Wis. L. Rev. 1323, 1379. Still, there is an evidentiary standard that must be met before submission of a lesser included offense instruction to the jury. *Id.* The trial court must submit a lesser-included offense instruction only when there are reasonable grounds in the evidence for acquittal on the original offense *and* conviction on the lesser offense. *State v. Jenkins,* 168 Wis. 2d 175, 202, 483 N.W.2d 262, 272 (Ct. App.), *cert denied,* 113 S.Ct. 608 (1992). In deciding whether this evidentiary standard is met, the evidence is viewed in the light most favorable to the defendant. *Id.*

If a reasonable view of the evidence is sufficient to support a guilty verdict beyond a reasonable doubt for the original offense and the lesser included offense, then no lesser included offense instruction need be given. *State v. Weeks,* 165 Wis. 2d 200, 209, 477 N.W.2d 642, 645 (Ct. App. 1991). However, if a reasonable view of the evidence supports a guilty verdict of the lesser included offense beyond a reasonable doubt but casts reasonable doubt as to some element or elements of the original offense, then both verdict questions should be submitted to the jury upon request. *Id.* at 209, 477 N.W.2d at 645-46.

This appeal has been narrowed by the state's concession that the evidence provides a reasonable basis for Chapman's acquittal of first-degree intentional homicide. The battle line is drawn over whether a reasonable

view of the evidence supports conviction on the lesser included offense of second-degree reckless homicide.

■

Second-degree reckless homicide is committed by any individual who causes the death of another human being by creating an unreasonable and substantial risk of death or great bodily harm to that human being and the individual is aware of that risk. Sections 940.06 and 939.24, Stats. Our analysis centers on whether there is reasonable evidence that Chapman was aware that burying his son created the unreasonable and substantial risk of death.

Chapman makes a two-pronged argument in support of his assertion that the court erred in not submitting the lesser included offense instruction on second-degree reckless homicide. First, he argues "as he did before the trial court" that evidence of recklessness exists any time an adult parent informally buries what he or she believes is a dead child without first obtaining medical confirmation of death.

We agree with the trial court that Chapman's theory does not work. The crux of Chapman's argument is the idea that a "reasonable parent" should be aware of the substantial risk of death presented by burying a child prematurely. However, as the trial court pointed out, the question is not whether a reasonable parent should be aware, but whether Chapman himself was aware of the substantial risk of death if the child was being buried prematurely.

Anticipating our answer to his first argument, Chapman then points to evidence showing that he was, in fact, aware that his infant son might not be dead and that his decision to go ahead and bury his son anyway was a reckless decision. Chapman points to a statement he made on the third morning of custody when he asked

242

whether Michael was dead or alive when they found him and to his statement that a person can appear to be dead and yet remain alive.

We hold that these two statements offer no support for the view that Chapman was actually and subjectively aware of the risk that burying his infant son without seeking medical confirmation of death was reckless, but that he was still willing to expose Michael to the risk. We need look no further than *State v. Borrell,* 167 Wis. 2d 749, 781, 482 N.W.2d 883 (1992). In that case, the defendant walked within three feet of a jewelry salesman and fatally shot him in the back. The defendant sought to rely on the testimony of an acquaintance who said that, after the shooting, the defendant was crying and saying "he didn't want to kill the guy." The defendant wanted an instruction on second-degree murder, contending that this statement was evidence which would allow the jury to conclude that the defendant did not intend to kill the jewelry salesman.

The supreme court disagreed. It held that the witness' statement said nothing about the defendant's state of mind at the time of the incident. *Id.* at 781, 482 N.W.2d at 895. An after-the-fact exclamation about what one would have liked to have happened and what actually happened are two different things. *See id.*

■

Like *Borrell,* Chapman's statements are after-the-fact and do not accurately reflect his state of mind at the time he was with his son. His statements were made on the third day of custody. These afterthoughts did not attempt to portray his state of mind at the time of the incident, but rather his state of mind on the third day of custody. The trial court was correct. We affirm the trial court's refusal to give the lesser included offense instruction of second-degree reckless homicide.

Chapman contends that the trial court erred when in determining his specific parole eligibility date under sec. 973.014(2), Stats., it took into consideration the 301 days he spent in confinement before sentencing. His proposition is that after the trial court sets the parole eligibility date, the amount of time served in presentence confinement must be subtracted from the specific parole eligibility date to arrive at his actual parole eligibility date.

Chapman contends that the application of presentence credit is a matter of equal protection. He challenges the statutory classification of sec. 973.014, Stats., that gives to the trial court two options when sentencing persons to a mandatory life term.[1] The chal-

---

[1] Section 973.014, Stats., provides:

**Sentence of life imprisonment; parole eligibility determination.** When a court sentences a person to life imprisonment for a crime committed on or after July 1, 1988, the court shall make a parole eligibility determination regarding the person and choose one of the following options:

**(1)** The person is eligible for parole under s. 304.06(1).

**(2)** The person is eligible for parole on a date set by the court. Under this subsection, the court may set any later date than that provided in s. 304.06(1), but may not set a date that occurs before the earliest possible parole eligibility date as calculated under s. 304.06 (1).

The Wisconsin Supreme Court explained the options this statute gives to the trial court. The trial court can defer to sec. 973.014 (1), Stats., which prescribes the absolute minimum amount of time a defendant must spend in prison before being eligible for parole. *State v. Borrell,* 167 Wis. 2d 749, 765-67 n.6, 482 N.W.2d 883, 889 (1992). Or, the court can turn to sec. 973.014(2) and establish a parole eligibility date that is consistent with the particular circumstances of the case; for example, a particularly

244

lenger to a statutory classification must prove an abuse of legislative discretion beyond a reasonable doubt. *State v. Nyborg,* 122 Wis. 2d 765, 769, 364 N.W.2d 553, 555 (Ct. App. 1985). A challenge to the difference in treatment of criminal defendants is subject to the rational basis test. *See Hilber v. State,* 89 Wis. 2d 49, 54, 277 N.W.2d 839, 842 (1979). As we have previously held, any reasonable basis for the difference in treatment will validate the statute. The challenger has only been denied equal protection of the law if the classification chosen by the legislature is irrational or arbitrary. *Parker v. Percy,* 105 Wis. 2d 486, 493, 314 N.W.2d 166, 169 (Ct. App. 1981) (citing *Omernik v. State,* 64 Wis. 2d 6, 18-19, 218 N.W.2d 734, 741-42 (1974)).

Other challenges to classifications that treated criminal defendants sentenced to a mandatory life term differently from all other criminal defendants have survived the rational basis test. In *Hilber* the supreme court upheld the denial of youthful offender status to defendants found guilty of crimes carrying a penalty of life imprisonment. The court held that in imposing a mandatory life term for some criminal activity the legislature expressed its view that such conduct stands apart from other criminal conduct in its gravity and impact on society. *See Hilber,* 89 Wis. 2d at 56, 277 N.W.2d at 843.

---

loathsome criminal act. *Borrell,* 167 Wis. 2d at 765-67 n.6, 482 N.W.2d at 889.

A defendant sentenced under sec. 973.014(1), Stats., is eligible for parole according to a formula the legislature sets forth in sec. 304.06, Stats. This formula is used to calculate the discretionary parole eligibility date and takes into consideration any presentence confinement credit. On the other hand, a defendant sentenced under sec. 973.014(2) has his or her parole eligibility date established by the sentencing court and not by the formula in sec. 304.06.

In *Parker* we approved of the legislative scheme denying industrial good time to persons serving mandatory life terms. We wrote that the heinous quality of the act that resulted in a life term was a rational basis for the classification created by the legislature. *Parker,* 105 Wis. 2d at 493-94, 314 N.W.2d at 170.

In denying a challenge to the constitutionality of sec. 973.014, Stats., the supreme court wrote that the statute indicates legislative recognition that according to public policy, "some criminal offenses, such as first degree murder, are so egregious that they should carry a sentence of life imprisonment and the defendant convicted of such an offense should be confined away from society for a *mandatory minimum period of time.*" *Borrell,* 167 Wis. 2d at 765, 482 N.W.2d at 888 (emphasis added).

We are satisfied that the heinous nature of first-degree intentional homicide creates a rational basis for treating those convicted of that crime differently from those convicted of crimes not carrying a penalty of mandatory life imprisonment. We are also satisfied that there is a rational basis for creating the classifications in sec. 973.014, Stats. As the supreme court noted in *Borrell,* 167 Wis. 2d at 767, 482 N.W.2d at 889, the particular circumstances of each case and each convicted person provide a rational basis for the two options given the sentencing court in sec. 973.014. Either repeated criminal behavior or a particularly gruesome crime is a rational basis for establishing a parole eligibility date without the benefit of the statutory formula that considers presentence confinement credit.

Relying upon *Klimas v. State,* 75 Wis. 2d 244, 248-50, 249 N.W.2d 285, 287-88 (1977), and *State v. Walker,* 117 Wis. 2d 579, 586, 345 N.W.2d 413, 416 (1984), Chap-

man argues that as an indigent defendant he has a constitutional right to have his presentence confinement credited against his parole eligibility date.[2]

Chapman's argument would have merit if the option of sec. 973.014(2), Stats., permitting the trial court to set a parole eligibility date without consideration of presentence confinement credit treated indigent and nonindigent defendants differently. The statute's classification is based on the nature of the crime and the characteristics of the defendant and not on financial considerations. In denying consideration of credit for presentence confinement to a class of convicted defendants the legislature has not denied them a right to such credit.

No person has a legal or constitutional right or entitlement to parole. *Borrell,* 167 Wis. 2d at 764, 482 N.W.2d at 888. Any rights a defendant has to parole are those that the legislature creates as a matter of grace or favor. *Id.* The legislature has designed a parole system that uses formulas to calculate when a person is eligible for parole and when a person has reached the mandatory release date. *See* secs. 304.06(1)(b) and 302.11, Stats. Both formulas give a person day-for-day credit for the time incarcerated before sentencing. *See* sec. 973.155, Stats. Both formulas specifically exempt persons serving a term of life imprisonment. Section 302.11(1m) prohibits the mandatory release of any person sentenced under sec. 973.014, Stats., and sec. 304.06(1)(b) excludes life sentences imposed under sec. 973.014(2). This legislative

---

[2] Although Chapman asserts that his presentence confinement was the result of his indigency, he failed to develop a record that his remaining in jail during the pendency of this action was the result of his financial inability to post bail.

scheme strictly controls the release of prisoners serving mandatory life terms. This scheme complements the public policy declaration that those who commit particularly heinous and hideous crimes are deserving of mandatory minimum periods of confinement.

We conclude that the public policy behind sec. 973.014(2), Stats., would be frustrated by giving a defendant credit for presentence incarceration after the trial court establishes a parole eligibility date. To reduce the mandatory minimum period of confinement ordered by the trial court would ignore the rational basis for the difference in treatment of criminal defendants and unduly depreciate the seriousness of the offense.

*By the Court.*—Judgment and order affirmed.