STATE of Wisconsin, Plaintiff-Respondent,

v.

Rodney FOSTER, Defendant-Appellant.†

Court of Appeals

*No.  93–2844–CR.  Submitted on August 2, 1994.—Decided January 10, 1995.*

(Also reported in 528 N.W.2d 22.)

†Petition to review denied.

16

For the defendant-appellant the cause was submitted on the briefs of *Legal Assistance to Institutionalized Persons Program*, with *John Allan Pray*, of Madison.

For the plaintiff-respondent the cause was submitted on the briefs of *James E. Doyle*, attorney general, and *Sally L. Wellman*, assistant attorney general.

Before Wedemeyer, P.J., Sullivan and Schudson, JJ.

SCHUDSON, J.    Rodney Foster appeals from the judgment of conviction, following a jury trial, for first-degree intentional homicide while armed, contrary to §§ 940.01(1) and 939.63, STATS. He argues that the trial court erred by: (1) denying his request for an instruction on the lesser-included offense of second-degree intentional homicide (unnecessary force in defense of self or others); and (2) modifying the standard jury instruction on intoxication as a defense by substituting the word "may" for "must." We affirm.

18

## I. BACKGROUND

The facts relevant to the issues on appeal are not in dispute. According to the trial testimony, shortly after midnight on July 22, 1992, Foster and several companions including Ronald Bell ("Blackie") arrived at the area near the front of the residence of Bobbe A. Norwood-Reed, a boy who was fifteen years old when he testified at the trial in March 1993. Blackie was "hollering" and "screaming" at Lamont, one of Norwood-Reed's companions, and Blackie hit Lamont on the head with a beer bottle. Blackie then was "hollering" and "screaming" at Norwood-Reed and pointed a gun at him.

Foster tried to calm Blackie. Dennis Dundy then came out of a car and also tried to calm Blackie. Foster got Blackie's gun, approached Dundy from the side or rear, grabbed Dundy from the back or side and shot him three times. Testimony from Gene Robert Mizell, a forensic fellow at the Milwaukee County Medical Examiner's Office, established that the shots were fired from a distance of "between a couple of inches to a couple of feet" and that the entrance wounds were through the right side of the head, the left shoulder, and the back of the left side of the neck.

There was little evidence to explain why Foster, who had been trying to calm Blackie, would shoot Dundy, who also was trying to calm Blackie. One of Norwood-Reed's companions, however, testified that after the shooting Blackie said, "Why you shooting him, man," or, "You didn't have to shoot him, man," or words to that effect. Norwood-Reed testified that immediately after the shooting, he heard Foster tell Blackie, "You told me to." There also was substantial evidence that Foster was intoxicated.

19

The evidence also established that Dundy had a gun. Almost all the witnesses who observed the incident, however, stated that Dundy never took the gun out of his pants, or that he had only taken out the gun during the initial argument involving Blackie, Lamont, and Norwood-Reed. In this regard, some of the testimony was ambiguous and confusing and failed to distinguish the earlier phase of the altercation when some witnesses said that Dundy had his gun out, and the later phase when Dundy was shot and when almost all the witnesses said Dundy did not have his gun out.

The one possible exception to this scenario was provided in the testimony of Benjamin Godbolt, another young companion of Norwood-Reed. Responding to cross-examination from Foster's lawyer, Godbolt testified:

A:  I see Dennis lifting his shirt up, and the gun was in his waistband.

Q:  And he had his hand on the gun; is that right?

A:  No, he had his hand on his shirt lifting it up.

Q:  You saw the gun, right?

A:  Right.

Q:  And then you saw him go for the gun, didn't you?

A:  No.

Q:  ... I'm not talking about when Foster is next to Dundy. I'm talking about when Blackie and Dundy are arguing.

A:  No, he didn't go for his gun.

Q:  At what point did Dundy go for his gun?

A: When I guess he was still looking behind him he knew somebody was coming behind him then he went for his gun.

\* \* \* \*

Q: Is the point at which Dundy went for his gun, is that the point at which Rodney was approaching him?

A: Yes.

Q: All right. And where was Rodney . . . in comparison to where Dundy was standing when Dundy was pulling the gun out of his pants pocket?

A: About like five feet away, couple feet away.

Godbolt, however, also testified that Foster "crept up behind Dennis and shot him," and that no one pulled a gun on either Blackie or Foster.

Foster testified repeatedly that he had no recollection of the shooting, although he also stated that he remembered Dundy having a gun. At one point he testified, "I remember he pulled it out," but without any specification related to any phase of the incident. He also testified that he did not know whether, at the time of the shooting, he was trying to take away Dundy's gun. Foster testified that he did not remember why he shot Dundy, and did not know whether he was acting in self-defense or defense of Blackie.

Foster argues that he was entitled to an instruction on second-degree intentional homicide (unnecessary force in defense of self or others). He contends:

[T]he . . . evidence establishes all that is required to get an instruction on second-degree intentional homicide. There is no evidence that Foster was

21

involved in the dispute, or had any particular motive to kill Dundy—in fact he had tried to calm [Blackie] down. So why did Foster kill Dundy? Although he could not remember what exactly was going through his mind at the time of the shooting, it is not farfetched to maintain that Rodney Foster was afraid of Dundy. Nor is it implausible that a reasonable person would have been afraid that Dundy was going to shoot either Foster or [Blackie]. Dundy was involved in a heated argument with [Blackie]; Dundy had earlier pulled out his gun at [Blackie]; Dundy "went for" his gun as Foster approached him. Foster could have had an objectively reasonable belief that he was preventing Dundy from unlawfully interfering with either himself or [Blackie].

The trial court, denying the requested lesser-included offense instruction, concluded:

The testimony is basically undisputed from all of the eye-witnesses that the victim was restrained at the time, . . . the gun of the victim was not pointed at the defendant in any manner, and that the defendant took the victim, shot him . . . once in the arm and then twice in the head.. . .

* * * *

I am going to find that based upon the evidence in this case no matter what witness you look at, whatever tilt you put to this case, in looking at this case in a light most favorable to the defense, even disregarding what the defendant says happened, . . . no reasonable jury could find that the defendant was exercising self-defense at the time of the offense. There is no evidence of self-defense in this case; and the jury would only have to speculate in order to come to that conclusion.

Accordingly, although the trial court did grant the defense request to instruct on the lesser-included offense of first-degree reckless homicide, it denied the request for several other lesser-included offenses, including second-degree intentional homicide. ·

## II. LESSER-INCLUDED OFFENSE INSTRUCTION

A challenge to a trial court's refusal to submit a lesser-included offense instruction presents a question of law which we review *de novo*. *State v. Borrell* 167 Wis. 2d 749, 779, 482 N.W.2d 883, 894 (1992). "The submission of a lesser-included offense instruction is proper *only* when there exists reasonable grounds in the evidence both for acquittal on the greater charge and conviction on the lesser offense." *Id.* In determining the propriety of a defendant's request for a lesser-included offense instruction, the evidence must be viewed in the light most favorable to the defendant and the requested instruction. *State v. Chapman*, 175 Wis. 2d 231, 241, 499 N.W.2d 222, 226 (Ct. App. 1993). Further, "the lesser-included offense should be submitted only if there is a reasonable doubt as to some particular element included in the higher degree of crime." *Hayzes v. State*, 64 Wis. 2d 189, 195, 218 N.W.2d 717, 721 (1974). "If the court improperly fails to submit the requested lesser included offense to the jury, it is prejudicial error and a new trial must be ordered." *Hawthorne v. State*, 99 Wis. 2d 673, 684, 299 N.W.2d 866, 871 (1981).

Second-degree intentional homicide—imperfect or unnecessary force in defense of self or others—is a lesser-included offense of first-degree intentional homicide. *See* §§ 940.01(2) & 940.05, STATS. Both

crimes require that the defendant caused the death of the victim, and that the defendant intended to kill the victim. As relevant to this case, the lesser-included offense of second-degree intentional homicide includes an additional element: "that the defendant did not reasonably believe that the force used was necessary to prevent imminent death or great bodily harm . . .." WIS J I—CRIMINAL 1052.[1]

As the supreme court recently reiterated in *State v. Camacho*, 176 Wis. 2d 860, 501 N.W.2d 380 (1993):

> Section 939.48, Stats. 1985-86, defines the privilege of self-defense. Section 939.48, Stats. provides in pertinent part:
>
> > **939.48 Self-defense and defense of others. (1)** A person is privileged to threaten or intentionally use force against another *for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by such other person.* The actor may intentionally use only such force or threat thereof as he reasonably believes is necessary to prevent or terminate the interference. He may not intentionally use force which is intended or likely to cause death or great bodily harm unless he rea-

---

[1] WIS J I—CRIMINAL 1050 states the third element of second-degree intentional homicide as "that the defendant did not reasonably believe that the force used was necessary to prevent imminent death or great bodily harm *to himself.*" We do not read this, however, to exclude the prevention of imminent death or great bodily harm *to others. See* WIS J I—CRIMINAL 1050 n.5 ("The absence of the complete privilege of self-defense is a fact necessary to constitute the offense of second degree intentional homicide, assuming there is evidence of the complete privilege in the case.").

> sonably believes that such force is necessary to prevent imminent death or great bodily harm to himself. . . .
>
> According to the unambiguous language of sec. 939.48, Stats., a person is privileged to act in self-defense only if that person reasonably believes that he is preventing or terminating an unlawful interference with his person.

*Id.* at 871-872, 501 N.W.2d at 384 (emphasis and bold in *Camacho*).

In this case, we conclude that the trial court correctly determined that there was no evidence of self-defense. There was overwhelming evidence that Dundy never drew his gun at the time or in a way precipitating the shooting. At most, ambiguous testimony from Godbolt may have suggested that Dundy went for his gun just before being shot, perhaps in reaction to his perception that Foster was about to attack or shoot him from the side or rear.

Further, there was no testimony from Foster or any other witness that he shot Dundy "for the purpose of preventing or terminating what *he reasonably believe[d]* to be an unlawful interference." *See id.* Indeed, as Foster conceded in his testimony, having no recollection of the shooting, he did not know whether he was acting in defense of himself or Blackie. Thus, on appeal, it is not surprising that all Foster is able to argue is that his theory of his possible motivation for the shooting is "not farfetched" and not "implausible." As the trial court correctly noted, however, the jury's acceptance of such a theory could be based only on speculation, not on any evidence of what Foster "rea-

sonably believed." Therefore, we conclude that the trial court was correct in denying Foster's request for the lesser-included instruction of second-degree intentional homicide.

## III. INTOXICATION INSTRUCTION

Foster argues that the trial court erred in modifying the standard instruction on voluntary intoxication. As applicable to this case, the standard instruction provides:

> In deciding whether the defendant acted with the intent to kill, you *must* consider the evidence that he was intoxicated at the time of the alleged offense. If the defendant was so intoxicated that he did not intend to kill, you must find him not guilty of first-degree intentional homicide while armed. Before you may find the defendant guilty, the State must prove by evidence that satisfies you beyond a reasonable doubt that the defendant intended to kill.

*See* WIS J I—CRIMINAL 765 (emphasis added). The trial court modified the standard instruction by substituting "may" for "must." The trial court explained that, with the exception of the instructions regarding the burden of proof and elements of the crime, "I know of nowhere that a court ever tells a jury that they must take into consideration certain evidence. They are told they should consider all evidence, and they should weigh it."

A trial court has wide discretion in developing the specific language of jury instructions. *State v. Herriges*, 155 Wis. 2d 297, 300, 455 N.W.2d 635, 637 (Ct. App. 1990). Further, the trial court's instructions do not have to conform exactly to the standard jury instructions. *Camacho*, 176 Wis. 2d at 883, 501 N.W.2d at 389.

Nevertheless, the work of the Criminal Jury Instructions Committee is persuasive and, generally, it is recommended that trial courts use the standard instructions because they do represent a painstaking effort to accurately state the law and provide statewide uniformity. *See State v. Kanzelberger*, 28 Wis. 2d 652, 659, 137 N.W.2d 419, 422-423 (1965), *cert. denied*, 385 U.S. 867 (1966). Because the standard instructions are *not* infallible, it is appropriate for a trial court to modify them when necessary to fully and fairly state the law. *See McMahon v. Brown*, 125 Wis. 2d 351, 354, 371 N.W.2d 414, 416 (Ct. App. 1985).

In this case there is no question that substantial evidence of Foster's intoxication entitled him to the intoxication instruction. The issues are whether the trial court's modification of the standard instruction was erroneous and, if erroneous, whether Foster was denied due process of law as a result. We conclude that neither the standard instruction nor the trial court's modification correctly states the law. We also conclude, however, that the trial court's modification of the instruction, offered in the context of this case, did not mislead the jury.

Under § 939.42, STATS., intoxication can negate the element of intent. Thus, whether Foster was "so intoxicated that he did not intend to kill" Dundy could have distinguished his guilt for first-degree intentional homicide from his guilt for first-degree reckless homicide. Foster argues that the trial court's instruction presented "[t]he possibility that the jury could have decided to not even consider the intoxication evidence."

As the State correctly argues, the standard instruction erroneously advises a jury that it *"must consider the evidence *that* he was intoxicated."* Explic-

27

itly, these words advise a jury not merely to consider evidence, but rather, to consider evidence in a way that favors the intoxication defense. As Foster correctly argues, however, the trial court's modification also is erroneous because it advises a jury that it "may consider the evidence that he was intoxicated." A jury could interpret this to mean that it need not consider that evidence at all. We conclude that a correct statement of the law should be conveyed by instructing a jury that it "must consider the evidence regarding *whether* the defendant was intoxicated at the time of the alleged offense."

■

Whether jury instructions violate a defendant's right to due process is a question of law subject to *de novo* review. *State v. Pettit*, 171 Wis. 2d 627, 639, 492 N.W.2d 633, 639 (Ct. App. 1992). In reviewing an error in the instructions, we do not view the challenged word or phrase in isolation. *Id.* at 637, 492 N.W.2d at 638. Rather, jury instructions "must be viewed in the context of the overall charge." *Id.* Relief is not warranted unless the appellate court is "persuaded that the instructions, when viewed as a whole, misstated the law or misdirected the jury" in the manner asserted by the challenger. *Id.* at 638, 492 N.W.2d at 638. Where a criminal defendant claims that the jury instructions violated constitutional due process, the issue is whether there is a reasonable likelihood that the jury applied the instruction in a way that violates the defendant's rights. *Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 481-482, 116 L.Ed.2d 385, 399 (1991). In making that assessment, we consider the challenged portion of the instructions in context with all other instructions provided by the trial court. *Id.*

28

Reviewing the trial court's modified intoxication instruction in context with all the instructions, we conclude that there is no reasonable likelihood that the jury applied the instruction in a way that violated Foster's rights. If, indeed, the instruction implied that the jury did not have to consider evidence regarding whether Foster was intoxicated, we would see merit to his claim. In this case, however, in addition to the instruction on intoxication, the trial court instructed the jury to "[c]onsider only the evidence received during this trial," and reiterated, "You are to decide the case solely on the evidence offered and received at trial." Additionally, the trial court instructed:

> Intent to kill must be found as a fact before you can find the defendant guilty of first degree intentional homicide. You cannot look into a person's mind to find out his intent.
> You may determine such intent directly or indirectly from all of the facts and evidence concerning this offense. You may consider any statements or conduct of the defendant which indicate his state of mind. You may find intent to kill from such statements or conduct, but you are not required to do so.

Thus, the trial court offered several instructions that required the jury to consider all the evidence. Further, several of these instructions included the term "may" in a way that clearly communicated that the jury was responsible for making certain factual determinations. Therefore, in context, the word "may" emerged in the instructions not as a term giving permission to the jury to consider evidence, but rather, as a term explaining the jury's authority to reach certain determinations based on its evaluation of the evidence. *See Smith v. State*, 248 Wis. 399, 404, 21 N.W.2d 662, 664 (1946) ("may"/"must" controversy over intoxication jury

instruction—"impossible that the jury was misled into thinking that they could consider or ignore the subject of intoxication at their option").

In this case, there is no question that the parties effectively litigated the issue of whether Foster's alleged intent to kill was legally vitiated by his intoxication. Nowhere in the instructions or closing arguments do we see anything to indicate that the jury was misled into thinking that it no longer had to consider evidence of whether Foster was intoxicated, and whether intoxication reduced his culpability. Accordingly, although neither the standard instruction nor the trial court's instruction was a correct statement of the law, we conclude that the trial court's modification of the standard instruction did not deny Foster due process of law.

*By the Court.*—Judgment affirmed.