COURT OF APPEALS
DECISION
DATED AND FILED

March 31, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2077-CR**

Cir. Ct. No. **2016CF1203**

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT II

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

LATONIO D. SIMPSON,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Kenosha County: MARY KAY WAGNER, Judge. *Affirmed.*

Before Neubauer, C.J., Gundrum and Davis, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Latonio D. Simpson appeals from a judgment of conviction for one count of first-degree intentional homicide, by use of a dangerous weapon, as a party to a crime. *See* WIS. STAT. §§ 940.01(1)(a), 939.05, 939.63(1)(b) (2015-16).[1] He also appeals from an order denying his postconviction motion for sentence modification or resentencing. Simpson argues: (1) the judgment should be vacated because he was not formally arraigned and, therefore, the trial court lacked competency to proceed; (2) the trial court erroneously exercised its discretion when it limited Simpson's cross-examination of a detective and the error was not harmless; (3) the trial court erred when it denied Simpson's request to instruct the jury on first-degree reckless homicide; and (4) the sentence requiring Simpson to serve fifty years in prison before being eligible for extended supervision was harsh and excessive. We reject Simpson's arguments and affirm.

## BACKGROUND

¶2 The criminal complaint alleged that sixteen-year-old Simpson and a man named James L. Butler both fired guns at Willie Owens, who lived in a house where Simpson, Butler, and several other men had an argument earlier in the day. Owens died of his gunshot wounds. Simpson was charged with first-degree intentional homicide.[2]

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] The record indicates that Butler was also charged; however, he died before he could be apprehended.

¶3      The trial court denied Simpson's motion for a reverse waiver to juvenile court, and the case proceeded to a jury trial where Simpson testified in his own defense.  Simpson admitted that after the argument earlier in the day, he, Butler, and two other men returned to the house; Butler and Simpson both had guns.  At the house, they exchanged words with men on the porch who, according to Simpson, also had guns.[3]  Owens spoke with Butler and then approached him.  Butler pushed Owens and "pulled his gun out."  Simpson described what happened next:

> I looked up to make sure there was no police coming because we could get in trouble for having guns.
>
> Before you knew it, as I'm looking off, I heard shots.  I started running.  I pulled a gun out.  As I'm … running, I'm hearing shots.  I started firing over my shoulder.

¶4      In contrast to Simpson's testimony, the two men who were with Simpson and Butler testified that after Owens was shot by Butler, Owens fell to the ground, and Simpson stood over him and shot him before fleeing the scene.  In addition, several witnesses testified that Simpson subsequently made statements that implied he was not running away when he shot Owens.  Specifically, the woman who drove Simpson and Butler away from the scene said she heard Simpson ask Butler, "[D]id you see his eyes?  Did you see his eyes when the bullets hit him?"

¶5      Later that night, Butler, Simpson and others went to the woman's house to drink, smoke marijuana, and play cards.  One man who was at the house that night testified that he heard Simpson and Butler talking about shooting

---

[3] None of the other witnesses, including the two men who accompanied Simpson and Butler, testified that Owens and the others at the home displayed guns.

Owens. The witness testified they said that Butler "started in the knee and worked his way up and [Simpson] said, I finished him off." Another witness who was at the house testified that he also heard Simpson say, "I finished him off."

¶6 The jury was instructed on first-degree intentional homicide and second-degree intentional homicide, both as a party to a crime and by use of a dangerous weapon. The jury was also instructed on self-defense. The jury found Simpson guilty of first-degree intentional homicide, which carries a mandatory sentence of life imprisonment. *See* WIS. STAT. § 939.50(3)(a) (2015-16). At sentencing, the trial court was required to determine whether Simpson would be ineligible for extended supervision, eligible after twenty years, or eligible at a date beyond twenty years. *See* WIS. STAT. § 973.014(1g). The trial court made Simpson eligible for extended supervision after serving fifty years.

¶7 Simpson filed a postconviction motion seeking sentencing modification or resentencing. He argued that he is serving "a virtual life sentence" and that the trial court "failed to fully address and account for Simpson's age" and his "immaturity and vulnerability to being manipulated and even coerced." The trial court held a motion hearing and denied the motion. This appeal follows.

## DISCUSSION

¶8 Simpson challenges his conviction and sentence on numerous grounds. We consider each issue in turn.

### I. Challenge to the trial court's competency to proceed.

¶9 Simpson argues that the trial court's failure to conduct an arraignment requires this court to vacate his conviction because the trial court lost competency to proceed. It is undisputed that at the conclusion of the preliminary

4

hearing, the trial court found probable cause that Simpson had committed first-degree intentional homicide, by use of a dangerous weapon, as a party to a crime. Trial counsel acknowledged receipt of the information, waived its formal reading, and said that Simpson was "aware of the charge against him, as well as the maximum possible penalties." Trial counsel said that he did not want Simpson to formally enter a plea until the reverse waiver hearing was completed, to ensure that he was not waiving his rights.

¶10 The State did not object to delaying the entry of a plea, indicating that if Simpson was unsuccessful at the reverse waiver hearing, Simpson could be arraigned at that time. The trial court agreed to Simpson's request. Three months later, the trial court denied the reverse waiver. At the conclusion of the reverse waiver hearing, the parties discussed scheduling, but they did not return to the arraignment, and Simpson did not formally enter a not guilty plea. After numerous delays and a mistrial, the case was eventually tried to a jury eight months later, resulting in Simpson's conviction.

¶11 We agree with the State that the trial court did not lose competency to proceed. Our supreme court considered this issue long ago, in *Hack v. State*, 141 Wis. 346, 124 N.W. 492 (1910). In *Hack*, "[b]y a singular oversight the defendant was not formally arraigned in the circuit court, and never pleaded to the information." *Id.* at 349. The supreme court declared: "[T]he right of arraignment and plea will be waived by the defendant by his silence when he ought to demand it, in all cases (except capital cases) where it appears that he is fully informed as to the charge against him, and is not otherwise prejudiced in the trial of the case by the omission of that formality." *Id.* at 353.

5

¶12     In subsequent cases, the supreme court held that "where there was no objection to an arraignment held after commencement of trial and no showing of prejudice by reason of the delay, the right to a more timely arraignment and plea would be deemed waived." *See **Bies v. State***, 53 Wis. 2d 322, 325, 193 N.W.2d 46 (1972) (citing ***Bridges v. State***, 247 Wis. 2d 350, 375, 19 N.W.2d 862 (1945)); *see also **State v. Martinez***, 198 Wis. 2d 222, 235, 542 N.W.2d 215 (Ct. App 1995) (holding that trial court had authority to proceed even though information was not read to the defendant at the arraignment, where defendant did not object or subsequently allege prejudice) (citing ***Hack*** and ***Bies***).

¶13     Simpson argues that ***Bies*** and ***Bridges*** "are limited solely to arraignments which are untimely, but are conducted before jury deliberations and verdicts." He further asserts: "[L]egislative developments since ***Hack*** strongly suggest the components of an arraignment in a criminal prosecution is essential to the statutory scheme and Simpson asserts a defendant's mere silence cannot waive this formal procedural responsibility even while he is fully informed of the charges."

¶14     We are not persuaded that legislative enactments have overruled ***Hack***, and we do not have authority to overrule our supreme court or our prior decisions. *See **Cook v. Cook***, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). Simpson did not raise the issue concerning the lack of a formal arraignment until his appeal, and he has not demonstrated that he was prejudiced by the oversight. He is not entitled to relief.

**II. Limitation of a detective's testimony.**

¶15     At trial, the State introduced testimony from the detective who interviewed Simpson after his arrest. On cross-examination, trial counsel asked

6

the detective, "During your interview with Mr. Simpson, did you indicate to him that, quote, I believe you just got scared. When that shit happened, you were afraid and you popped off a couple rounds, not trying to kill anybody?" The State objected on two grounds: relevancy and hearsay. After a sidebar, the trial court sustained the objection. It does not appear that the reason for the trial court's ruling was ever explained on the record.

¶16 Simpson argues that the trial court's discretionary ruling was erroneous and that the exclusion of the detective's statement was not harmless error. He asserts:

> The ruling limiting the detective's cross-examination is not harmless because the jury was denied the only opportunity it would have to reconcile Simpson's confession and, ultimately, his trial testimony supporting the lesser-included verdict. There was, of course, trial testimony inconsistent with Simpson's version of the event. It was, therefore, critical if the jury were to find guilt of the lesser-included homicide, that Simpson's youthful attempt to describe the complicated sequence and origin of the shots he fired were clearly understood and his credibility and accuracy fairly evaluated by the jury.

¶17 As best we can discern, Simpson believes that asking the detective to confirm that the detective made that particular statement during the interview was important because it suggested that Simpson told the detective he acted out of fear and the detective actually believed him. However, as the State points out, the detective subsequently explained that one tactic he uses to induce defendants to answer questions is to minimize their role in the offense. The detective indicted that when he uses this tactic, he does not "necessarily" hold the opinion that the defendant's role in the offense was minimized. In light of this testimony, it is highly unlikely that allowing the detective to testify about the statement he made to Simpson would have had the desired effect.

7

¶18    Even if Simpson is correct that the jury needed to hear a statement from the detective acknowledging that Simpson acted out of fear, the State has identified a similar statement from the detective that was admitted at trial. Specifically, when the State was cross-examining Simpson, it noted that during the interview, the detective told Simpson, "Well, you were probably scared.  You know, you were probably doing this because you were scared."

¶19    We conclude that because this similar statement was admitted later in the trial, and because the excluded statement was highly unlikely to have the desired effect, any potential error by the trial court in sustaining the objection to trial counsel's question earlier in the trial was harmless.  *See State v. Monahan*, 2018 WI 80, ¶33, 383 Wis. 2d 100, 913 N.W.2d 894 ("An erroneous evidentiary ruling is reversible only if 'a substantial right of the party is affected.'") (quoting WIS. STAT. § 901.03(1)).  Therefore, we will not further discuss whether the State's objection to the defense's question to the detective was properly sustained.

**III.  Denial of request for first-degree reckless homicide instruction.**

¶20    During the jury instruction conference, Simpson asked the trial court to instruct the jury on first-degree reckless homicide, which the parties agree is a lesser-included offense of first-degree intentional homicide.[4]  *See State v. Morgan*, 195 Wis. 2d 388, 440, 536 N.W.2d 425 (Ct. App. 1995).  The trial court denied the request, explaining:  "It isn't reckless conduct.  It was deliberate with self-defense or deliberate with privilege in some manner or form.  But I don't

---

[4] The trial court also denied Simpson's request for an instruction on second-degree reckless homicide.  Simpson has explicitly abandoned that claim on appeal so we will not discuss it.

think it's reckless. I don't think … that fits the evidence that we've had in this case." Simpson now challenges that decision.

¶21    Whether a trial court properly refused to instruct the jury on a lesser-included offense is an issue of law that we review de novo. *State v. Borrell*, 167 Wis. 2d 749, 779, 482 N.W.2d 883 (1992), *overruled on other grounds by State v. Greve*, 2004 WI 69, ¶31, 272 Wis. 2d 444, 681 N.W.2d 479. "In determining the propriety of a defendant's request for a lesser-included offense instruction, the evidence must be viewed in the light most favorable to the defendant and the requested instruction." *State v. Foster*, 191 Wis. 2d 14, 23, 528 N.W.2d 22 (Ct. App. 1995). "The submission of a lesser-included offense instruction is proper *only* when there exists reasonable grounds in the evidence both for acquittal on the greater charge and conviction on the lesser offense." *Borrell*, 167 Wis. 2d at 779. "[T]he lesser-included offense should be submitted only if there is a reasonable doubt as to some particular element included in the higher degree of crime." *Foster*, 191 Wis. 2d at 23 (citation omitted).

¶22    The crime of first-degree reckless homicide is committed by one who "recklessly causes the death of another human being under circumstances which show utter disregard for human life." *See* WIS. STAT. § 940.02(1); *see also* WIS JI—CRIMINAL 1020. Simpson argues that the jury should have been instructed on first-degree reckless homicide because "[t]he jury could have reasonably determined, based on trial testimony of eyewitnesses, [that] Simpson fired one or more shots toward Owens before he simultaneously turned and ran firing over his shoulder." He argues that his "discharge of his weapon as he turned and ran is consistent with reckless homicide as it arguably exhibited, under those circumstances, utter disregard for human life."

9

¶23     We conclude that the trial court properly refused to instruct the jury on first-degree reckless homicide because the basis for Simpson's claim that his conduct was merely reckless—that he fired his gun over his shoulder as he was running away, hitting Owens in the chest—was contradicted by the physical evidence. It was undisputed that the bullet that entered Owens's chest and lodged in his back came from the gun Simpson fired. The assistant medical examiner testified that the bullet "move[d] in a downward trajectory through [Owens's] body so it would be consistent with a gun having been fired in a downward direction." Simpson's testimony is contradicted by the physical evidence and does not provide "reasonable grounds … both for acquittal on the greater charge and conviction on the lesser offense." *See Borrell*, 167 Wis. 2d at 779.

## IV.  Challenge to Simpson's sentence.

¶24     Simpson argues that the trial court's decision to make Simpson eligible for extended supervision only after serving fifty years of initial confinement was harsh and excessive. First, he challenges the trial court's exercise of discretion. He asserts that the trial court "failed to fully address and account for his age at the time of the crimes, or how children are different, or how Simpson's immaturity and vulnerability to being manipulated or even coerced by gang culture mitigate his culpability." He contends that if the trial court had fully considered those factors, it would not have imposed "a virtual life sentence."

¶25     At sentencing, the trial court must consider the principal objectives of sentencing, including the protection of the community, the punishment and rehabilitation of the defendant, and deterrence to others, *State v. Ziegler*, 2006 WI App 49, ¶23, 289 Wis. 2d 594, 712 N.W.2d 76, and it must determine which objective or objectives are of greatest importance, *State v. Gallion*, 2004 WI 42,

¶41, 270 Wis. 2d 535, 678 N.W.2d 197. In seeking to fulfill the sentencing objectives, the circuit court should consider a variety of factors, including the gravity of the offense, the character of the offender, and the protection of the public, and it may consider additional factors. *State v. Odom*, 2006 WI App 145, ¶7, 294 Wis. 2d 844, 720 N.W.2d 695. The weight to be given to each factor is committed to the trial court's discretion. *See State v. Stenzel*, 2004 WI App 181, ¶16, 276 Wis. 2d 224, 688 N.W.2d 20.

¶26　Applying those standards, we reject Simpson's argument that the trial court erroneously exercised its sentencing discretion. The trial court considered the parties' sentencing arguments, which included a discussion of Simpson's age and his developing brain. When the trial court made its sentencing decision, it discussed each of the principal sentencing objectives, identifying key facts about the crime, Simpson's character, and his "serious rehabilitative needs." For instance, when it discussed the crime, the trial court noted that Owens "was not involved in any argument with anybody" and had tried to serve as a peacemaker, telling the men that they were not going to fight on his property. The trial court rejected Simpson's version of the shooting, stating: "[T]he story of shooting over one's shoulder and running away is just nonsensical, and [t]he [c]ourt does adopt the theory and the testimony that you stood over this gentleman and pointed that gun at him and shot him in the chest." Our review of the sentencing transcript leads us to conclude that the trial court applied the standard sentencing factors and explained their application in accordance with the framework set forth in *Gallion* and its progeny. In doing so, the trial court did not erroneously exercise its discretion.

¶27　Simpson's second argument is that a sentence requiring him to serve fifty years before he is eligible for extended supervision is unconstitutional under

11

the Eighth Amendment because it is "harsh and excessive." He cites United States Supreme Court case law discussing the development of juvenile brains and the constitutionality of imposing sentences that will not allow the juvenile an opportunity for release. *See, e.g., **Miller v. Alabama***, 567 U.S. 460, 465 (2012) (holding that mandatory sentences of life without parole for those who committed crimes as juveniles are unconstitutional).

¶28     We are not persuaded that Simpson's sentence is unconstitutional. First, the United States Supreme Court has not foreclosed life sentences without parole for juveniles. *See **id.*** at 479 (declining to consider whether life sentences without parole are categorically barred for juveniles and indicating that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon"); *see also **State v. Barbeau***, 2016 WI App 51, ¶¶32, 37-38, 370 Wis. 2d 736, 883 N.W.2d 520 (holding that "it is not unconstitutional to sentence a juvenile to life imprisonment without the possibility of supervised release for intentional homicide if the circumstances warrant it" and rejecting constitutional challenge to state statute that requires all defendants convicted of first-degree intentional homicide, including those who committed their crimes as juveniles, to serve a minimum of twenty years in prison before being eligible for extended supervision).

¶29     More importantly, the sentence imposed in this case does not deny Simpson the possibility of release; he is eligible for extended supervision after serving fifty years. Simpson refers to this as a "de facto life sentence," but he will be eligible for release when he is sixty-six years old. Simpson asserts that "most state appellate courts hav[e] held that a single sentence deferring eligibility for 50 years or more is a de facto life sentence," but he does not identify those states. Instead, he provides a general citation to a January 2019 article in the State Bar of

Wisconsin's *Wisconsin Lawyer* magazine. In any event, it is undisputed that Wisconsin is not one of the states that has held that setting eligibility for extended supervision at fifty years for someone who committed homicide at age sixteen is a de facto life sentence, and we are not persuaded it is.

¶30 The State urges this court to affirm, arguing:

> Simpson cites to no controlling authority that says sentencing a 17-year-old to life imprisonment with eligibility for supervision when he is 66 years old for a wanton and callous first-degree intentional homicide constitutes cruel and unusual punishment. Considering the [trial] court's findings concerning the severity of Simpson's offense, his lack of remorse, and the effect on the community, Simpson's sentence does not shock the public conscience. Thus, no constitutional violation occurred.

We agree with this analysis and conclude that the trial court's sentence making Simpson eligible for extended supervision after serving fifty years does not violate the Eighth Amendment.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

13