MICHAEL J. GABLEMAN, J.
¶ 1 This is a review of an unpublished, authored decision of the court of appeals affirming the Lafayette County Circuit Court's[1] judgment of conviction against Kyle Lee Monahan.[2]
*896 State v. Monahan, No. 2014AP2187-CR, unpublished slip op., 2017 WL 1504259 (Wis. Ct. App. Apr. 27, 2017). Monahan raises a single issue for our review: was the erroneous exclusion of data from a portable GPS unit harmless?
¶ 2 We hold that the circuit court's erroneous exclusion of the GPS data was harmless, and therefore affirm the decision of the court of appeals.
I. FACTUAL AND PROCEDURAL BACKGROUND
¶ 3 Monahan was involved in a single-vehicle crash that took place on August 20, 2011, in Shullsburg, Wisconsin. As a result of this crash, Monahan was seriously injured and his girlfriend, R.C., who was also in the vehicle, was killed. The State subsequently charged Monahan with three counts of criminal conduct: (1) homicide by intoxicated use of a motor vehicle contrary to Wis. Stat. § 940.09(1)(a) (2011-12)[3] ; (2) homicide by intoxicated use of a vehicle contrary to § 940.09(1)(b)[4] ; and (3) homicide by negligent operation of a vehicle contrary to Wis. Stat. § 940.10(1). The only factual dispute at trial was whether it was Monahan or R.C. who was driving at the time of the crash.
¶ 4 Monahan and R.C. met in early summer 2011 and started dating shortly thereafter. R.C. worked as a nanny in the Chicago suburb of Glenview, and she would often drive to Shullsburg on weekends to visit Monahan. The crash occurred during one such weekend.
¶ 5 R.C. arrived in Shullsburg at approximately 12:30 p.m. on Saturday, August 20, 2011. The couple engaged in several social activities during the course of that day. One such event was a birthday party for Monahan's cousin, which was held at that cousin's farm. Monahan and R.C. arrived at the farm in R.C.'s Saab 9-5 station wagon at approximately 6:30 p.m. Monahan and R.C. each had a couple drinks, but left approximately 45 minutes later at about 7:15 p.m. because R.C. was exhausted from the day.[5] Multiple eyewitnesses testified that Monahan was in the passenger seat when he left in the Saab with R.C.
¶ 6 After leaving the party, the Saab experienced a catastrophic rollover event. Both Monahan and R.C. were ejected from the vehicle. At the scene, emergency personnel asked Monahan multiple times how many people were in the Saab in order to ensure there were no others to be found (first responders were especially concerned by an empty child seat they found in the back of the Saab, which R.C. kept in her vehicle due to her job as a nanny).
*897 ¶ 7 Multiple emergency personnel asked Monahan who was driving. To each, he initially stated that he did not know, but then stated that he probably was the driver.[6] Throughout the following several hours, Monahan's recollection of who had been driving at the time of the crash continued to evolve, eventually adhering to the conclusion that he, in fact, had been the driver. While in a medical helicopter on the way to the hospital, Monahan unequivocally stated that he was driving the Saab. At the hospital, after undergoing emergency surgery, Monahan-unprompted-asked for a pen and pad of paper and wrote that he remembered the accident and that he had been driving. However, on January 13, 2012, while signing a DNA sample consent form, Monahan told Wisconsin State Trooper Ryan Zukowski, "[i]t doesn't matter, you know, I wasn't driving." Ten months after the accident, in July 2012, Monahan told Wisconsin State Trooper Thomas Parrott "[i]t's not like I meant [it to] F'ing happen." At trial, Monahan testified that he did not remember the accident and did not remember ever admitting that he was the driver.
¶ 8 The State and Monahan engaged their own respective experts. Trooper Parrott prepared a report and testified on behalf of the State. Paul Erdtmann, a Licensed Professional Engineer, prepared a report and testified on behalf of Monahan.
¶ 9 Erdtmann and Trooper Parrott both came to some of the same conclusions. Both experts agreed that the Saab was traveling between approximately 87 and 100 miles per hour when the crash sequence began. The crash sequence began when the Saab's wheels left the pavement and fell onto the grassy shoulder. After leaving the pavement, the Saab "furrowed" towards the passenger's side-that is, the Saab moved sideways through the grassy shoulder area such that the passenger's side (and not the front) of the Saab was leading the path of travel. The Saab went airborne after "tripping" on something on the shoulder and rolled multiple times with the passenger's side leading the rolls.
¶ 10 Both experts also agreed that at the time of the crash, the passenger's side window was open, the sunroof was open, the driver's side window was closed, neither occupant wore their seatbelt, and both occupants were ejected from the Saab. The experts further agreed that R.C. had been ejected from the vehicle before Monahan based on each occupant's resting position at the crash scene.
¶ 11 The two experts disagreed, however, as to the ultimate conclusion to be *898 drawn from the physical evidence. Trooper Parrott concluded that Monahan was the driver. He based this conclusion on a number of pieces of physical evidence. First, the amount of dirt on both R.C. and Monahan's clothing indicated that R.C. had been in the passenger's seat. R.C.'s clothes were covered in dirt; conversely, Monahan's clothes were relatively clean. This indicated to Trooper Parrott that R.C. was in the passenger's seat because the Saab would have kicked up substantial amounts of dirt that would have entered the vehicle through the open passenger's side window. Further, the passenger's side windowsill had an area where the dirt was rubbed off. Based on the amount of dirt on each occupant's clothing, Trooper Parrott concluded that R.C. rubbed the dirt off the windowsill while she exited the Saab.
¶ 12 Next, Trooper Parrott testified that the physics of the crash showed that R.C. had been ejected through the open passenger's side window, making it likely she had been seated in the passenger's seat and not the driver's seat at the time of the crash. He further testified that the positions of the driver's seat and front passenger's seat in the Saab indicated that Monahan was driving.
¶ 13 Finally, Trooper Parrott testified that the driver's side airbag was covered in blood. Analysts at the State Crime Lab found Monahan's DNA in this blood. Analysts found a second DNA profile in the blood, but it was insufficient for identification. This indicated that Monahan had to be in the driver's seat, as his blood would not have covered the airbag had he been in the passenger's seat.
¶ 14 On the other hand, Erdtmann testified that he could not determine, to a reasonable degree of engineering certainty, who had been driving at the time of the accident. He agreed with Trooper Parrott that R.C. had been ejected first, but he concluded that R.C. could have been ejected through the open sunroof and therefore could have been the driver. He testified that it was equally likely that R.C. was ejected through the sunroof from the driver's seat as it was that she was ejected through the passenger's side window from the passenger's seat.
¶ 15 In regard to the seat positions, Erdtmann conducted a test on an exemplar Saab that was the same model and year as R.C.'s. He placed the seats in the exact positions at which they were found after the crash. He then found individuals to serve as models who were approximately the same height and weight as Monahan and R.C. The R.C. model was able to reach the pedals and steering wheel from the driver's seat with no "physical constraints." The Monahan model was able to "comfortably" sit in the passenger's seat. On rebuttal, the State offered the testimony of R.C.'s mother, who testified that R.C. "would always have her seat as close up to the steering wheel as she possibly could" and that the R.C. model was "much farther back than [R.C.] would have been."
¶ 16 Erdtmann also testified that he inferred that the second DNA profile found on the driver's side airbag was R.C.'s. He testified that, given the jostling that occurred inside the Saab while it was rolling, the DNA was inconclusive as to seat position-meaning that Monahan's DNA could have fallen on the driver's side airbag from the passenger's seat when the Saab was rolling.
¶ 17 It is against this factual backdrop that we come to the evidentiary crux of this matter-the erroneously excluded GPS data. R.C. owned a portable GPS unit that she kept in the Saab. The GPS unit recorded timestamped coordinates when it was powered on. This allowed both Erdtmann and Trooper Parrott to recreate the *899 Saab's movements and calculate its speed on the date of the accident.
¶ 18 The data extracted from the GPS unit for the trip commencing at approximately 7:15 p.m. on August 20, 2011, from the farm to the crash site showed that the Saab was driving at a high rate of speed-sometimes in excess of 100 miles per hour-after leaving the farm. It also showed that after leaving the farm, the Saab stopped for approximately two minutes in downtown Shullsburg before resuming the trip. Neither party presented any direct evidence as to what happened during this stop. After resuming the trip, the Saab again traveled at a high rate of speed-again sometimes exceeding 100 miles per hour-during the time period between the two-minute stop and the crash.
¶ 19 Both the State and Monahan filed pretrial motions regarding the GPS data for the portion of the trip between the farm and the two-minute stop. Monahan moved for its admission, intending to use the GPS data of the entire trip between the farm and the crash to show that the same person was likely driving both before and after the stop in Shullsburg. He based this argument on the fact that the GPS data revealed similar driving patterns both before and after the stop. He reasoned that combined with eyewitness testimony that R.C. was driving when the pair left the farm, the jury could reasonably conclude that R.C. was driving at the time of the crash.
¶ 20 The State opposed admission of the GPS data detailing the portion of the trip between the farm and Shullsburg, arguing that only the GPS data of the segment between Shullsburg and the crash should be admitted. The State argued that admitting the GPS data relating to the trip between the farm and Shullsburg would constitute other acts evidence used to show propensity. See Wis. Stat. § 904.04(2).[7] The State argued that, if Monahan's motion was granted, the GPS data would be improperly used to show that R.C. had a propensity for driving above the speed limit, and thus must have been driving at the time of the crash. See id.
¶ 21 The circuit court denied Monahan's motion and admitted only the GPS data relating to the period of time between the two-minute stop in Shullsburg and the crash.[8] This ruling reflected the circuit court's determination that the GPS data between the farm and two-minute stop *900 constituted other acts evidence offered to show R.C.'s propensity for driving fast. In the circuit court's view, the continuum of relevant events leading to the crash started at the two-minute stop, not the farm.
¶ 22 Although the GPS data relating to the time period between the two-minute stop and the crash was admitted, it did not become the centerpiece of either party's case. In fact, after its introduction into evidence, it was not discussed again until the State's closing argument. In closing argument, the State asserted that it did not "make sense that a young girl who doesn't know the area is driving on some rural road and driving, no less, after she'd been drinking[,] and at speeds of 40 to 50 miles per hour over the speed limit[.] That doesn't make sense."
¶ 23 The jury returned verdicts of guilty as to all three counts.[9]
¶ 24 Monahan appealed, arguing that the circuit court erroneously excluded the GPS data relating to the time period between the farm and the two-minute stop in Shullsburg. The State conceded-and the court of appeals accepted for purposes of appeal-that the circuit court's exclusion of the GPS data was erroneous.[10] Monahan, 2014AP2187-CR, ¶ 2. However, the court of appeals concluded that the error was harmless. Id. In explaining its conclusion, the court of appeals emphasized the strength of the State's case. Id., ¶ 17.
¶ 25 First, the court of appeals noted that Monahan's many admissions that he had been driving at the time the accident provided strong evidence for the State. Id., ¶¶ 19-26.
¶ 26 Next, the court of appeals noted that Monahan had never substantially contradicted Trooper Parrott's testimony that Monahan had been the driver. Id., ¶ 33. The court observed that Erdtmann testified that "it was possible that either Monahan or R.C. was the driver." Id., ¶ 37. It further observed that Erdtmann's testimony regarding his exemplar of the vehicle's seats and his conclusions therefrom had been rebutted by the testimony of R.C.'s mother, which would have allowed the jury to accept Trooper Parrott's reconstruction. Id., ¶¶ 38-39.
¶ 27 Finally, the court of appeals chastised the State for exploiting the excluded GPS data in closing argument. Id., ¶ 29. However, it concluded that the State's discussion was harmless because its argument concerning the excluded evidence comprised an aggregate of five sentences out of approximately 70 transcript pages of closing argument. Id.
*901 ¶ 28 The court of appeals determined that "even if the jury heard the excluded GPS data evidence, the GPS data would have paled in comparison to the strong evidence that Monahan was driving at the time of the accident." Id., ¶ 40. Consequently, the court of appeals saw "no reason to think that, in light of all the evidence that Monahan was the driver, admission of the excluded evidence would have changed the outcome of this case." Id.
¶ 29 Monahan petitioned this court for review, which we granted on November 13, 2017.
II. STANDARD OF REVIEW
¶ 30 Circuit court evidentiary decisions are reviewed for an erroneous exercise of discretion. State v. Hunt, 2014 WI 102, ¶ 20, 360 Wis. 2d 576, 851 N.W.2d 434. However, in this case, the State concedes that the circuit court erroneously exercised its discretion in excluding the GPS data from the farm to the two-minute stop.[11]
¶ 31 Whether a circuit court's erroneous exclusion of evidence is harmless is a question of law we review de novo. Id., ¶ 21.
III. ANALYSIS
¶ 32 We first set forth and discuss the harmless error rule. We next apply the rule to Monahan. We then hold that the circuit court's erroneous exclusion of the GPS data was harmless, and consequently affirm the decision of the court of appeals.
A. The Harmless Error Rule
¶ 33 An erroneous evidentiary ruling is reversible only if "a substantial right of the party is affected." Wis. Stat. § 901.03(1). We construe this to mean that an error is harmless if the party benefitted by the error shows "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Hunt, 360 Wis. 2d 576, ¶ 26, 851 N.W.2d 434 (quoting State v. Harris, 2008 WI 15, ¶ 42, 307 Wis. 2d 555, 745 N.W.2d 397 ). In the present case, the State has the burden to prove "beyond a reasonable doubt that a rational jury would have found [Monahan] guilty absent the error." Id. (quoting State v. Harvey, 2002 WI 93, ¶ 49, 254 Wis. 2d 442, 647 N.W.2d 189 ).
¶ 34 The harmless error rule originated in response to the perception that appellate courts were "applying a rule approximating automatic reversal" when trial error was found. John M. Greabe, The Riddle of Harmless Error Revisited, 54 Hous. L. Rev. 59, 67 (2016) ; see also 7 Wayne R. LaFave, et al., Crim. Proc. § 27.6(a) (4th ed. 2017). The United States Supreme Court aptly described the problem: "So great was the threat of reversal, in many jurisdictions, that criminal trial became a game for sowing reversible error in the record, only to have repeated the same matching of wits when a new trial had been thus obtained." Kotteakos v. U.S., 328 U.S. 750, 759, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). The goal of the harmless error rule is to "inject reasoned judgment ... into appellate review" to ensure retrials occur only when the error actually affected the original trial. Id. at 759-60, 66 S.Ct. 1239 ; see also Harry T. Edwards, To Err is Human, but not Always Harmless: When Should Legal Error be Tolerated?, 70 N.Y.U. L. Rev. 1167, 1174 (1995).
¶ 35 We use several non-exclusive factors to aid our application of the harmless *902 error rule in the evidentiary context: (1) the frequency of the error; (2) the importance of the erroneously included or excluded evidence to the prosecution's or defense's case; (3) the presence or absence of evidence corroborating or contradicting the erroneously included or excluded evidence; (4) whether erroneously excluded evidence merely duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the State's case; and (7) the overall strength of the State's case. State v. Martin, 2012 WI 96, ¶ 46, 343 Wis. 2d 278, 816 N.W.2d 270 ; State v. Norman, 2003 WI 72, ¶ 48, 262 Wis. 2d 506, 664 N.W.2d 97 ; see also Hunt, 360 Wis. 2d 576, ¶ 27, 851 N.W.2d 434 ; State v. Nelson, 2014 WI 70, ¶ 46, 355 Wis. 2d 722, 849 N.W.2d 317.
B. Application to Monahan
1. Frequency of the error
¶ 36 This factor requires us to consider whether the error scarcely appeared in the record or pervaded it. Martin, 343 Wis. 2d 278, ¶ 47, 816 N.W.2d 270. An error that pervades the record is more likely to be harmful than an error that appears only a few times, though an error may be so prejudicial that reversal is required despite appearing in the record only once. See id.; see also United States v. Impson, 531 F.2d 274, 278 (5th Cir. 1976).
¶ 37 In this case, the error manifested in the record once. The GPS data was not a centerpiece of the State's case, but rather was mentioned only briefly in closing argument, when the State argued that it did not make sense that a driver who was unfamiliar with the area would operate a vehicle at the speed the Saab was traveling at the time of the crash. While the excluded GPS data would have undoubtedly undercut this argument because it would have allowed the jury to conclude that R.C. had, in fact, been operating the Saab at a high rate of speed over (presumptively) unfamiliar roadways, the argument was not central to the State's theory of the case. The State's theory of the case rested on Trooper Parrott's crash reconstruction; the argument that R.C. would not have driven so recklessly given her unfamiliarity with the area constituted a miniscule percentage of a 70-page closing argument transcript.[12]
¶ 38 This is in contrast to Martin, where erroneously-admitted testimony constituted the bulk of the State's case. Id. The testimony was "discussed at length in both the State's opening statement and closing argument." Id. The error was repeated often in the record and was "the backbone of the State's argument." Id. The extent to which the State relied upon the excluded GPS data in the present case simply did not rise anywhere close to that level of repetition, duration, or extent. We conclude that this factor weighs in favor of the State.
2. Importance of the erroneously excluded evidence
¶ 39 This factor considers the extent to which the excluded evidence impacted the verdict. Hunt, 360 Wis. 2d 576, ¶ 29, 851 N.W.2d 434 ; Nelson, 355 Wis. 2d 722, ¶ 47, 849 N.W.2d 317 ; see also Martin, 343 Wis. 2d 278, ¶ 51, 816 N.W.2d 270. Exclusion of evidence that would go to the *903 foundation of the verdict is less likely to be harmless than exclusion of evidence that would have little impact on the verdict. See Martin, 343 Wis. 2d 278, ¶ 51, 816 N.W.2d 270.
¶ 40 The excluded GPS data did not go to the foundation of the verdict. Rather, the excluded GPS data is direct evidence of a fact that is not of consequence: how fast the Saab was traveling between the farm and the two-minute stop. Given the other evidence presented-and emphasized-by the parties, the GPS data would have been largely inconsequential to the verdict.
¶ 41 Hunt, while factually disparate, is instructive on this question. 360 Wis. 2d 576, 851 N.W.2d 434. In that case, the defendant, Hunt, was convicted of causing a child under 13 to view or listen to sexual activity based on an incident in which Hunt showed his adopted daughter a video of sexual intercourse. Id., ¶¶ 1-2, 4. At the preliminary hearing, the victim testified that Hunt referred to the video as stuff that he received from a certain friend, Venske. Id., ¶ 5. Hunt admitted that the victim may have seen an image of a testicular hernia sent by Venske, but denied ever showing the victim a video of sexual intercourse. Id., ¶ 8. Hunt argued that the victim embellished the story due to an ongoing custody dispute. Id., ¶ 9.
¶ 42 Consistent with that defense, Hunt proffered testimony from Venske that he sent Hunt an image of a testicular hernia, but never sent Hunt a video of sexual intercourse. Id., ¶ 12. The circuit court excluded Venske's testimony. Id., ¶ 13. We held that the circuit court erroneously exercised its discretion when it excluded Venske's testimony because the testimony would have corroborated Hunt's testimony. Id., ¶ 25. We held the error to be harmless, however, because the source of the sexually explicit content was not an element of the crime. Id., ¶ 30. Stated differently, the excluded testimony did not go to the foundation of the verdict because it would have demonstrated a fact that was irrelevant to the crime charged. See id., ¶ 34.
¶ 43 Similarly, in the present case, the excluded GPS data would have bolstered Monahan's contention that R.C. may have been driving the Saab at the time it crashed. For this reason, excluding that portion of the GPS data was error. See id., ¶ 29. Establishing that the evidence was admissible does not, of course, answer the harmless error question. Id. Though the excluded GPS data should have been admitted, it nonetheless did not impact the verdict because it bears little relation to the elements of homicide by intoxicated use of vehicle. See Wis. Stat. § 940.09(1)(a).[13] Because neither the speed of the Saab between the farm and two-minute stop, nor who was driving it during that time period, were "required element[s] of the State's case, the value of [the excluded GPS data] lay solely in its potential to corroborate [Monahan]'s version of events." Hunt, 360 Wis. 2d 576, ¶ 34, 851 N.W.2d 434.
¶ 44 Thus, while the excluded GPS data may have added some credibility to Monahan's defense, it was not a fact that was important to the verdict. Accordingly, we conclude that this factor weighs in favor of the State.
3. The presence or absence of evidence corroborating or contradicting the erroneously excluded evidence
¶ 45 This factor is closely related to the preceding one, the importance of the erroneously *904 excluded evidence. Hunt, 360 Wis. 2d 576, ¶ 30, 851 N.W.2d 434. If other evidence demonstrates what the excluded GPS data was offered to show, or if the excluded GPS data would not contradict any of the State's evidence, then its erroneous exclusion is more likely harmless. See Martin, 343 Wis. 2d 278, ¶ 54, 816 N.W.2d 270.
¶ 46 The excluded GPS data was neither corroborated nor contradicted because no other evidence was admitted to establish the speed of the vehicle between the farm and the two-minute stop. Again, Hunt is helpful to our understanding of the application of this factor. 360 Wis. 2d 576, 851 N.W.2d 434. In Hunt, Venske's excluded testimony did not contradict any of the State's evidence because the State did not offer any evidence of the source of the sexually explicit video. Id., ¶ 33. In holding the error harmless, we reasoned that "the excluded evidence ... would not have served to weaken the State's case on the issue of where Hunt obtained the sexually explicit video, because the State never alleged it was sent by Venske." Id. A similar reasoning applies here: the excluded GPS data would not have served to weaken the State's case on the issue of how fast the Saab was traveling between the farm and the two-minute stop because the State never alleged that the Saab was speeding during that segment. Consequently, this factor weighs in favor of the State.
4. Whether the erroneously excluded evidence duplicates untainted evidence.
¶ 47 This factor reflects our understanding that the error is more likely harmless if the excluded evidence would serve only to duplicate admitted evidence. Nelson, 355 Wis. 2d 722, ¶ 50, 849 N.W.2d 317. Conversely, if the erroneously excluded evidence would have been the only evidence to support a factual finding by the jury, then the error is more likely prejudicial. See Martin, 343 Wis. 2d 278, ¶ 57, 816 N.W.2d 270.
¶ 48 Literal application of this factor leads us to observe that the GPS data does not duplicate any evidence because no other evidence regarding the speed of the Saab between the farm and two-minute stop was offered. The State did not offer any evidence as to either how fast the Saab was traveling or who was driving it between the farm and two-minute stop. Conversely, Monahan offered evidence in the form of eyewitness testimony that R.C. was driving when the couple left the farm. The excluded GPS data, had it been admitted, would have constituted circumstantial evidence that the same person was driving both before and after the two-minute stop. While the excluded GPS data would have fractionally overlapped with the eyewitness testimony, we cannot say that the erroneously excluded GPS data would have duplicated the eyewitness testimony-or any other untainted evidence. The result of our consideration is that this factor weighs in favor of Monahan.
5. The nature of the defense
¶ 49 If the erroneously excluded evidence closely fits the defense theory of the case, then its exclusion is more likely prejudicial. See State v. Deadwiller, 2013 WI 75, ¶ 43, 350 Wis. 2d 138, 834 N.W.2d 362 ; see also Martin, 343 Wis. 2d 278, ¶ 59, 816 N.W.2d 270. Conversely, if the erroneously excluded evidence would not have furthered the defense, its exclusion is more likely harmless. Nelson, 355 Wis. 2d 722, ¶ 49, 849 N.W.2d 317.
¶ 50 Monahan's defense was that either he or R.C. could have been driving at the time of the crash. Stated otherwise, Monahan argues that the jury could not have found beyond a reasonable doubt that Monahan was driving at the time of the crash. The excluded GPS data could have *905 raised an inference that the same person was driving both before and after the two-minute stop. When combined with the eyewitness testimony that R.C. was driving at the time the couple left the farm, this inference could have supported a jury determination that R.C. was driving at the time of the crash.
¶ 51 Although the weight, if any, the jury would have given to such an inference is (by definition) impossible to know, it is clear that the excluded evidence would have been complementary to the nature of the defense. Accordingly, this factor weighs in favor of Monahan.
6. The nature of the State's case
¶ 52 If the erroneously excluded evidence is consistent with the State's case, then its exclusion is more likely harmless. See Martin, 343 Wis. 2d 278, ¶ 60, 816 N.W.2d 270.
¶ 53 The GPS data is irrelevant to the State's case. The State focused its evidence on who was driving at the time of the crash; its theory of the case is compatible with either Monahan or R.C. driving between the farm and the two-minute stop. The State's evidence that Monahan was driving at the time of the crash-Trooper Parrott's crash reconstruction, Monahan's admissions, and the DNA found on the driver's side airbag-are not affected by who was driving between the farm and the two-minute stop. The GPS data would have neither bolstered nor undercut the State's case had it been admitted because the State's evidence was consistent with either Monahan driving the whole way or Monahan and R.C. switching seats during the two-minute stop.
¶ 54 Because the GPS data was not inconsistent with the State's case, this factor weighs in favor of the State.
7. The overall strength of the State's case
¶ 55 If the State's case was strong notwithstanding the erroneous exclusion of the GPS data, then the error is more likely harmless. Hunt, 360 Wis. 2d 576, ¶ 35, 851 N.W.2d 434. Conversely, if the State relied heavily on the exclusion of the GPS data, then the error is more likely to be prejudicial. Martin, 343 Wis. 2d 278, ¶ 62, 816 N.W.2d 270.
¶ 56 We first address Monahan's complaint that considering the strength of the State's case improperly transforms harmless error analysis into sufficiency-of-the-evidence analysis. We begin by noting that the strength of the State's case has long been considered an appropriate-and important-factor in harmless error analysis. E.g., Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("These factors include ..., of course, the overall strength of the prosecution's case."); United States v. Wilson, 134 F.3d 855, 867 (7th Cir. 1998) ("[ Van Arsdell ] recognize[ed] that, 'of course,' an important factor to consider is 'the overall strength of the prosecution's case.' "); State v. Fishnick, 127 Wis. 2d 247, 267, 378 N.W.2d 272 (1985) ; State v. Drusch, 139 Wis. 2d 312, 324 n.1, 407 N.W.2d 328 (Ct. App. 1987). Second, we understand that courts cannot properly answer the core question-whether the State proved "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"-without considering the strength of the State's case. See United States v. Littrell, 439 F.3d 875, 883 (8th Cir. 2006). Finally, we note that error is less likely to have a "substantial influence" on the verdict where the State presented overwhelming evidence of guilt. United States v. Lane, 474 U.S. 438, 450, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986).
*906 ¶ 57 For these reasons, consideration of the strength of the State's case has been-and remains-a proper and useful factor in evaluating whether a circuit court's error was harmless.
¶ 58 This factor cuts decisively in favor of the State because the State's case was strong, and would have remained strong even if the excluded GPS data had been admitted. First and foremost, Monahan's numerous admissions that he was driving provide substantial evidence of his guilt. He told Shullsburg firefighter Timothy Corley "I was driving, I guess" while lying in the cornfield. He then said "that is the last time I will drink and drive" within earshot of Deputy Klang. When Deputy Klang told Monahan that a female was also in the vehicle, Monahan said "I was probably driving, then." Once on the gurney, Monahan responded "yeah" when Deputy Gorham asked him "so you were the driver." While in the medical helicopter en route to the hospital, Monahan again unequivocally admitted to driving the Saab. While at the hospital, he again admitted to being the driver. He wrote that he remembered the crash and that he was driving. At the time of this writing, the attending nurse described him as "neurologically ... intact." Finally, ten months after the accident, Monahan told Trooper Parrott "[i]t's not like I meant [it to] F'ing happen."
¶ 59 Even if the jury had discounted all of Monahan's admissions, Trooper Parrott's crash reconstruction provided compelling evidence for the State. Trooper Parrott testified unequivocally that all of the physical evidence pointed to Monahan as the driver. Erdtmann, on the other hand, did not contradict Trooper Parrott's conclusion. In fact, Erdtmann concluded that Monahan could have been the driver. Erdtmann merely disagreed as to whether that was the only reasonable conclusion one could draw from the physical evidence.
¶ 60 Moreover, the physical evidence supported the State's assertion that Monahan was the driver. The seat positions-coupled with the testimony of R.C.'s mother that the driver's seat was found "much farther back than [R.C.] would have been"-indicated that Monahan was driving. The position of the bodies at the crash scene, the closed driver's side window, and the open passenger's side window indicated that R.C. was ejected first and from the passenger's seat. The dirt patterns on R.C.'s clothing-and the relative lack of dirt on Monahan's clothing-indicated that R.C. was in the passenger's seat, next to the open window.
¶ 61 All of these factors lead us to conclude that the State's case was very strong-and would have remained so even if the excluded GPS data had been admitted into evidence. Because of the strength of the State's case, we are not surprised that the jury came to the only reasonable conclusion: Monahan was driving at the time of the crash; this factor weighs in favor of the State.
***
¶ 62 Applying the relevant circumstances of Monahan's case to these factors leads to the conclusion that the erroneous exclusion of the GPS data was harmless; that is, the State has met its burden to prove "beyond a reasonable doubt that a rational jury would have found [Monahan] guilty absent the error." Hunt, 360 Wis. 2d 576, ¶ 26, 851 N.W.2d 434 (quoting Harvey, 254 Wis. 2d 442, ¶ 49, 647 N.W.2d 189 ).
¶ 63 Though we utilize the seven factors to aid in our analysis, harmless error is not subject to a precise mathematical formula. See State v. Bolstad, 124 Wis. 2d 576, 589-90, 370 N.W.2d 257 (1985) ; see also State v. Anthony, 2015 WI 20, ¶ 104, 361 Wis. 2d 116, 860 N.W.2d 10 ; State v. Grant, 139 Wis. 2d 45, 77, 406 N.W.2d 744 (1987)
*907 (Day, J., concurring) (describing the underlying rationale of the harmless error test to be "eliminating prejudicial error but not becoming bogged down in endless formulas for determining harmless error.").
¶ 64 Factors four and five weigh in favor of Monahan, as the excluded GPS data would have bolstered Monahan's theory of defense that R.C. was driving. Supra, ¶¶47-51. However, it would have done so by demonstrating a fact that was not necessary for conviction. Hunt, 360 Wis. 2d 576, ¶ 34, 851 N.W.2d 434 ; see also supra, ¶46.
¶ 65 Though the excluded GPS data would have bolstered Monahan's theory of defense, the factors weighing in favor of the State-especially the final factor, the strength of the State's case-"tip the scales in support of harmless error." Anthony, 361 Wis. 2d 116, ¶ 104, 860 N.W.2d 10. As in Hunt, the State's case did not hinge on establishing who was driving the Saab, and how fast it was traveling, between the farm and two-minute stop. See Hunt, 360 Wis. 2d 576, ¶ 36, 851 N.W.2d 434. Rather, the strength of the State's case rested largely on Monahan's five admissions that he was driving at the time of the accident, Trooper Parrott's crash reconstruction testimony, and the DNA evidence. See id. The State never raised at trial the issue of who was driving the Saab between the farm and two-minute stop, nor how fast it was traveling during that segment, in proving the essential elements of the crime for which Monahan was convicted. See id. We agree with the court of appeals that "the [excluded] GPS data would have paled in comparison to the strong evidence that Monahan was driving at the time of the accident." Monahan, 2014AP2187-CR, ¶ 40.
¶ 66 Based on the foregoing, we conclude that "it is beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Hunt, 360 Wis. 2d 576, ¶ 26, 851 N.W.2d 434 (quoting Harris, 307 Wis. 2d 555, ¶ 42, 745 N.W.2d 397 ).
IV. CONCLUSION
¶ 67 We hold that the circuit court's erroneous exclusion of the GPS data was harmless, and therefore affirm the decision of the court of appeals.
By the Court. -The decision of the court of appeals is affirmed.

The Honorable William D. Johnston, presiding.

The court of appeals also reversed a circuit court order granting Monahan's postconviction motion to relieve Monahan from paying the DNA surcharge. State v. Monahan, No. 2014AP2187-CR, unpublished slip op., ¶ 56, 2017 WL 1504259 (Wis. Ct. App. Apr. 27, 2017). Monahan states in his petition for review that he does not raise this issue for our review. Accordingly, we do not consider it further. See State v. Sulla, 2016 WI 46, ¶ 7 n.5, 369 Wis. 2d 225, 880 N.W.2d 659 (quoting Jankee v. Clark Cty., 2000 WI 64, ¶ 7, 235 Wis. 2d 700, 612 N.W.2d 297 ) ("If an issue is not raised in the petition for review or in a cross petition, 'the issue is not before us.' ").

All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

Though count one and two have the same title, they are based on different statutory provisions. Count one prohibits "[c]aus[ing] the death of another by operation or handling of a vehicle while under the influence of an intoxicant." Wis. Stat. § 940.09(1)(a). Count two prohibits "[c]aus[ing] the death of another by the operation or handling of a vehicle while the person has a prohibited alcohol concentration...." § 940.09(1)(b). See also infra note 9.

Between the time R.C. arrived in Shullsburg and the start of the party, Monahan and R.C. had socialized at his home and a local restaurant, and assisted his cousin in preparing for the party.

While Monahan was still lying on the ground after the crash, he told Shullsburg firefighter Timothy Corley "I was driving, I guess."
After Monahan was placed on a backboard at the side of the road, Lafayette County Sheriff's Deputy Paul Klang walked towards him to question him. While walking towards Monahan, Deputy Klang heard him say "that is the last time I will drink and drive." When Deputy Klang questioned Monahan directly, Monahan did not remember who was driving. After being informed a female was also in the vehicle, Monahan said "I was probably driving, then."
After Monahan was moved to a gurney, while being treated by EMS personnel, Lafayette County Sheriff's Deputy Michael Gorham asked Monahan who was driving. Monahan responded, "I don't know, I might have been." Shortly after this exchange, Deputy Gorham returned with a digital recorder at the instruction of Lafayette County Sheriff's Sergeant Darrell Morrissey. Deputy Gorham again asked Monahan, "were you the driver?" Monahan responded, "yeah, I guess." After informing Monahan that a firefighter reported seeing Monahan driving the car out of Shullsburg, Deputy Gorham asked Monahan "so you were the driver?" Monahan responded "yeah." Gorham followed up "you were?" Monahan again responded "yeah."

Wisconsin Stat. § 904.04(2) states, in relevant part: "[E]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith."

The pretrial motions filed by Monahan and the State also addressed GPS data that would show the Saab traveled at a high rate of speed on the way to the farm; a period during which the parties agree R.C. was driving. The circuit court excluded this GPS data for the same reasons it excluded the GPS data of the trip between the farm and Shullsburg. The extent to which Monahan appeals exclusion of the trip to the farm is unclear-at various points in briefing, he appears to challenge only the exclusion of the trip from the farm to Shullsburg, but at other points, he appears to also challenge the exclusion of the trip to the farm. The scope of the State's confession of error is similarly unclear. In its brief to the court of appeals-the first point at which the State confessed error in this case-the State conceded error only as to the trip between the farm and Shullsburg. However, other areas of briefing and oral arguments to this court indicate that the State may also confess error as to the trip to the farm. Neither party offers analysis of the trip to the farm separate from its analysis of the trip from the farm to Shullsburg.
We determine that separately addressing the exclusion of the GPS data relating to the trip to the farm is unnecessary because our analysis and holding would remain the same even if we assumed error regarding that trip.

The circuit court dismissed count two by operation of Wis. Stat. § 940.09(1m), which states in relevant part: "[a] person may be charged with and a prosecutor may proceed upon an information based upon a violation of any combination of sub. (1)(a) ... or (b) ... for acts arising out of the same incident or occurrence.... If the person is found guilty of more than one of the crimes so charged for acts arising out of the same incident or occurrence, there shall be a single conviction for purposes of sentencing...." The circuit court dismissed count three by operation of Wis. Stat. § 939.66(2), which states, in relevant part: "[u]pon prosecution for a crime, the actor may be conviction of either the crime charged or an included crime, but not both. An included crime may be ... [a] crime which is a less serious type of criminal homicide than the one charged."

The State agreed with Monahan that "[t]he vehicle's speed after it left the cousin's residence was not other acts evidence[,] but part of the continuum of facts relevant to the crime" pursuant to State v. Dukes, 2007 WI App 175, ¶ 28, 303 Wis. 2d 208, 736 N.W.2d 515. The court of appeals did not "weigh in on whether the [circuit] court erroneously excluded the GPS data," but rather accepted the State's concession for purposes of the appeal. Monahan, 2014AP2187-CR, ¶ 2.

We are not bound by a party's concession of law. State v. Anderson, 2014 WI 93, ¶ 19, 357 Wis. 2d 337, 851 N.W.2d 760. For purposes of this opinion, however, we assume without deciding that the circuit court's exclusion of the GPS data was erroneous.

The court of appeals considered five sentences in the State's closing argument to be objectionable. Monahan, 2014AP2187-CR, ¶ 29 ; see also infra, ¶27. Depending on how one classifies certain sentences in the State's closing argument, the objectionable portion of the State's closing argument could constitute up to three paragraphs or 24 lines of the transcript. See dissent, ¶ 3. This would add up to approximately one full page of transcript (the transcript pages from closing arguments contain 25 lines of text each) out of 70 pages of closing arguments, or approximately 1.4 percent.

A person commits homicide by intoxicated use of a vehicle if he "[1] causes the death of another [2] by the operation or handling of a vehicle [3] while under the influence of an intoxicant." Wis. Stat. § 940.09(1)(a).