COURT OF APPEALS
DECISION
DATED AND FILED

March 28, 2023

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP2123-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF2607

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

EDRICK LOVESS FUTCH,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JANET C. PROTASIEWICZ and JONATHAN D. WATTS, Judges. *Affirmed*.

Before Donald, P.J., Dugan and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Edrick Lovess Futch appeals a judgment of conviction entered following a court trial for two counts of soliciting a child for prostitution, and an order denying his postconviction motion.[1] On appeal, Futch contends that the trial court erred in barring the defense from asking a detective about a letter Futch wrote to the victim. In addition, Futch contends that his trial attorney was ineffective for failing to object to: (1) the use of fifteen prior convictions to impeach Futch; and (2) hearsay testimony from the victim's mother. We reject his arguments and affirm.

## BACKGROUND

¶2 According to the criminal complaint, on May 26, 2019, fifty-year-old Futch asked fifteen-year-old Natalie to come over to his house to style his daughter's hair.[2] When Natalie arrived, no one else was home and Futch told her to sit next to him on his couch. Futch said to Natalie, "can I be honest, I wanna fuck." Futch grabbed Natalie's face, leaned in to kiss her, and told her he would put his "big long dick" in her "coohice [sic], butt, and mouth." Futch also told Natalie he would pay her and give her marijuana to have sex with him. Natalie told Futch that she needed to go home. Futch said that he needed to go to the store, but would call her later.

---

[1] The Honorable Thomas Wolfgram presided over the court trial. The Honorable Janet C. Protasiewicz presided over the sentencing hearing. The Honorable Jonathan D. Watts decided Futch's postconviction motion. We refer to Judge Wolfgram as the trial court and Judge Watts as the postconviction court.

[2] For confidentiality purposes, we use pseudonyms to refer to the victim and the victim's mother.

¶3     Natalie met with Futch again later that day and recorded their conversation.  Futch can be heard saying on the recording that "You got two choices.  I can buy your pussy.  And when I mean I say I can buy it, I mean, we can fuck and I can bust a nut.  You can go your way and never tell anybody."  Futch also stated that "You can try to be slick.  Which will never happen.  You can try.  I gave you that money, I gave you that money for one reason only."  Afterwards, Natalie spoke to police and showed them missed calls from a number associated with Futch, and provided the recording.  Futch was charged with two counts of soliciting a child for prostitution.

¶4     Futch proceeded to a court trial.  The State called four witnesses: Natalie, Natalie's mother, Police Officer Cassandra Lindert, and Detective Michael Thomae.

¶5     Natalie testified that when she went over to Futch's house, he made comments about wanting to "fuck" her.  Futch pushed Natalie onto the couch, put his hand on Natalie's back, pulled down Natalie's pants, and looked at her "stuff."  Futch also told Natalie that he would "put [her] on," which is a street term for prostitution.  Futch told Natalie that he has a lot of girls that he can "put on" that make money and he used to be a pimp.

¶6     After Natalie left, she took her sisters to the park.  When she returned from the park, she had missed calls from Futch.  She returned to Futch's house and recorded him on her phone.  Futch gave her twenty dollars and went on to say "how he wanted to F [her]."  Futch stated that he had sex with plenty of fifteen-year-old girls, and he could pay her or she "could take it."  Futch's girlfriend then arrived home, and Futch pushed Natalie out the back door.

¶7     The State moved the recording into evidence, and played it for the trial court.[3]  Natalie testified that in the recording, Futch offered or expressed that he wanted to "buy the pussy" and made references to sex.

¶8     Natalie's mother, Leah, testified that after Natalie told her what happened, they went over to Futch's house.  She recounted that Futch denied saying anything sexual to Natalie, and claimed he gave Natalie money because he knows how it is to be that age and want to smoke weed.  When Leah returned home, Natalie played the recording she made of Futch.  After hearing the recording, Leah called the police.

¶9     Police Officer Lindert testified that she interviewed Natalie.  Natalie showed Lindert her phone, which showed missed calls from Futch.  Lindert also listened to the recording.

¶10    Detective Thomae testified that he interviewed Futch in August 2019, after Futch was arrested in Colorado.  Futch told Detective Thomae that he left Wisconsin because he knew there was a warrant out for his arrest and he wanted to make money to hire a lawyer.  Futch confirmed that he made the statements on the recording, and he knew that Natalie was fifteen.  Detective Thomae testified that he asked if Futch would write an apology note to the victim, and Futch stated that he would and wrote a letter to Natalie.  The State did not ask Detective Thomae any additional questions about the letter, and the letter was not entered into evidence.

---

[3]  A transcript of the recording was also provided to the court.

¶11    On cross-examination, Futch's attorney asked Detective Thomae "What did [Futch] say" in the letter, and "What did he apologize for?" The State objected.

¶12    The defense responded that the door had been opened and it had a right to present further information based on "the rule of completeness." The defense stated that the description of the letter as an "apology letter" implied that Futch apologized for soliciting Natalie for prostitution when in fact there was no such apology. The trial court sustained the objection. The court explained:

> if it's an inculpatory statement, you put it in…. [H]e can introduce it as evidence if he was making inculpatory statements in the letter.
>
> So I'm assuming it is not—I don't know. I don't know what's in the apology letter, but nonetheless to the extent that it is not an admission it's exculpatory. Therefore, [it is] hearsay.

¶13    Futch testified in his own defense. Prior to his testimony, the State went over Futch's criminal history and noted that Futch had fifteen prior convictions.[4] Defense counsel responded that fifteen sounded correct, and Futch also indicated that fifteen was correct. Futch then testified that he had fifteen prior convictions.

---

[4] According to the State at sentencing, Futch's fifteen prior convictions included: escape in 1989; driving or operating a vehicle without consent in 1990; criminal trespass to a dwelling in 1993; criminal damage to property in 1993; taking and driving a vehicle without consent, as a party to a crime, in 1995; resisting or obstructing an officer, as a party to a crime, in 1995; disorderly conduct in 2002; three convictions for violating a domestic abuse injunction in 2002; battery in 2003; violating a domestic abuse injunction in 2009; criminal damage to property in 2015; and two convictions for disorderly conduct in 2016.

¶14 Futch further testified that every time he stepped outside, Natalie would run up to him and ask if she could do his daughter's hair. Futch admitted that he made the recorded comments to Natalie, but claimed they were to "scare her" so that she would not bother him. Futch denied that he touched Natalie, and denied offering Natalie money in exchange for sex. Futch said that he gave her money to buy marijuana so that she would leave him alone. When asked what he meant on the recording when he said, "I can buy the pussy," Futch replied that he was saying those words in general.

¶15 The trial court found Futch guilty as charged. The court found that Futch's testimony was "absolutely incredible." The court stated that Futch's actions were "absurd," and "[i]f he's trying to get rid of her, it makes no sense in that context that he concedes to her wishes and gives her $20 to buy marijuana." The court stated that "[t]he credible testimony in this case came from [Natalie] and the plain meaning in the tape that [the court] heard."

¶16 Futch moved for postconviction relief. Futch argued that the trial court erred when it barred defense counsel from questioning Detective Thomae about Futch's letter to Natalie. Futch also argued that his trial attorney was ineffective when he failed to object to the court's use of "dated and irrelevant" prior convictions to impeach Futch's credibility, and Leah's testimony about the content of the recording that Natalie made.

¶17 In support of his motion, Futch filed a police report that provided the details of the letter. The letter, as described in the police report, included statements from Futch that "[a]ll I was trying to do was get you to do [sic] was leave me alone," and "I[']m so sorry for playing kid games, and lying to you about you doing my daughter hair I was drinking that day and was Jacking."

6

¶18 The postconviction court rejected Futch's arguments without a hearing. The court stated that all of Futch's claims fail for the same reason—Futch failed to establish that any of them would have made a difference to the outcome of the trial.

¶19 In regards to the letter, the postconviction court declined to reconsider the trial court's ruling, and stated that "in any event, [Futch] testified to the same explanation that [Futch] claims the court improperly excluded" and the "[a]dmission of the complete letter or further questioning of the detective would not have materially enhanced the credibility of [Futch's] testimony[.]" In regards to Futch's prior convictions, the court stated that whether he "had zero or one hundred prior convictions, his testimony and explanation for his words and actions was ridiculous," and limiting the number of prior convictions would not have changed the outcome. Finally, the court found that Leah's testimony about the recorded statements was not hearsay, and the exclusion of the testimony would not have changed the findings of guilt.[5]

¶20 This appeal follows. Additional relevant facts are referenced below.

**DISCUSSION**

I. **Letter to the Victim**

¶21 On appeal, Futch first renews his claim that the trial court erred when it barred his trial attorney from questioning Detective Thomae about the

---

[5] We note that Futch also sought an additional thirty days of sentence credit, which the postconviction court granted. This issue is not on appeal, so we do not discuss it further.

letter Futch wrote. Futch argues that the questions were not intended to prove the truth of the matter, but "to provide context" under "the rule of completeness."

¶22    As codified in WIS. STAT. § 901.07 (2021-22),[6] the rule of completeness provides that:

> [w]hen any part of a writing or statement, whether recorded or unrecorded, is introduced by a party, an adverse party may require the party at that time to introduce any other part or any other writing or statement which ought in fairness to be considered contemporaneously with it to provide context or prevent distortion.

Although the statute only refers to written or recorded statements, the rule of completeness has also been applied to oral statements. *See **State v. Eugenio***, 219 Wis. 2d 391, 408-10, 579 N.W.2d 642 (1998).

¶23    In response to Futch's argument, the State contends that the trial court properly exercised its discretion because Detective Thomae only testified that Futch wrote a letter and did not introduce the content of the letter. As a result, the content of the letter was not required "to provide context and prevent distortion." Alternatively, the State contends that the trial court properly exercised its discretion because Futch testified to the same explanation that he claims was improperly excluded, thus, any testimony about the content of the letter would have been cumulative. Lastly, the State argues that even if the trial court erred, any error was harmless.

¶24    Here, even if we assume that the trial court erred, we conclude that any error was harmless. An error is harmless "if the party benefitted by the error

---

[6] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

shows 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *State v. Monahan*, 2018 WI 80, ¶33, 383 Wis. 2d 100, 913 N.W.2d 894 (citations omitted). Whether an error is harmless is a question of law that we review *de novo*. *State v. Hunt*, 2014 WI 102, ¶21, 360 Wis. 2d 576, 851 N.W.2d 434.

¶25    According to the police report attached to the postconviction motion, Futch's letter to Natalie stated in pertinent part that "[a]ll I was trying to do was get you to do [sic] was leave me alone." This overlaps with Futch's trial testimony. At trial, Futch testified that his comments were made to "scare" Natalie so that she would not bother him. Futch also denied offering Natalie money in exchange for sex. The trial court found that Futch's testimony was "absolutely incredible," and specifically rejected his explanation of his actions and words. Further, the trial court found that "[t]he credible testimony in this case came from [Natalie] and the plain meaning in the tape that [the court] heard."

¶26    As the postconviction court found, the admission of the complete letter or further questioning of the detective would not have done anything to enhance the credibility of Futch's testimony. The content of the letter was merely cumulative to Futch's testimony. Therefore, we conclude that any error was harmless. *See Monahan*, 383 Wis. 2d 100, ¶33. Any error related to the letter did not contribute to the verdict. *Id.*

## II.    Ineffective Assistance of Counsel

¶27    Futch next renews his argument that his trial attorney was ineffective for failing to object to: (1) the use of "dated and irrelevant" prior convictions to impeach his credibility; and (2) testimony from Leah regarding what she heard on the recording.

¶28 When evaluating an ineffective assistance of counsel claim, we apply the well-established test in ***Strickland v. Washington***, 466 U.S. 668 (1984). Under ***Strickland***, a defendant must show both that counsel performed deficiently, and that the deficiency was prejudicial. ***Id.*** at 687. To demonstrate deficient performance, the person must show that counsel's representation fell below objective standards of reasonableness. *See* ***State v. McDougle***, 2013 WI App 43, ¶13, 347 Wis. 2d 302, 830 N.W.2d 243. To prove prejudice, a defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See* ***id.*** (citation omitted). If a defendant fails to make an adequate showing as to one prong of the test, we need not address the other. ***Strickland***, 466 U.S. at 697.

¶29 When a postconviction motion is denied without an evidentiary hearing, we review *de novo* "whether the motion on its face alleges sufficient material and non-conclusory facts that, if true, would entitle the defendant to relief" and "whether the record conclusively demonstrates that the defendant is not entitled to relief." ***State v. Jackson***, 2023 WI 3, ¶8, 405 Wis. 2d 458, 983 N.W.2d 608. "[I]f the motion does not raise facts sufficient to entitle the movant to relief, or presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." ***State v. Allen***, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433.

¶30 In this case, even if we assume that trial counsel performed deficiently, the record conclusively shows that Futch was not prejudiced by counsel's actions. *See* ***id.***

¶31    Turning first to Futch's claim regarding his prior convictions, we are not convinced that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *See* **Strickland**, 466 U.S. at 694.    As stated above, the trial court found that Futch's testimony was "absolutely incredible."    The trial court stated that Futch's explanations about his actions were "absurd" and that it "makes no sense" that Futch would give Natalie money to buy marijuana.    The trial court made no reference to Futch's prior convictions.    As the postconviction court found, even if the number of prior convictions had been limited, there is not a reasonable probability that this would have materially impacted the trial court's credibility assessment of Futch and resulted in an acquittal. *See* **id.**

¶32    Likewise, there is not a reasonable probability that had Leah's testimony about the recording been excluded, that the trial court would have acquitted Futch. *See* **id.**    The court heard the recording itself.    It did not need Leah's testimony regarding the content of the recording.    Leah's testimony was simply cumulative.

¶33    Therefore, the record conclusively shows that Futch is not entitled to relief, and the postconviction court properly denied Futch's postconviction motion without an evidentiary hearing.

## CONCLUSION

¶34    In sum, for the reasons stated above, we reject all of Futch's arguments, and affirm.

*By the Court.*—Judgment and order affirmed.

11

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.