COURT OF APPEALS
DECISION
DATED AND FILED

March 18, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP1445-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2019CF3114**

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ANTONIO O. BRATCHER,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Milwaukee County: J.D. WATTS, Judge. *Affirmed*.

Before White, C.J., Donald, and Geenen, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Antonio O. Bratcher appeals from a judgment, entered upon a jury's verdict, convicting him of one count of first-degree reckless

homicide while using a dangerous weapon, five counts of first-degree recklessly endangering safety while using a dangerous weapon, one count of possession of a firearm by a felon, and one count of fleeing law enforcement. Bratcher argues: (1) the circuit court erroneously admitted impermissibly suggestive lineup identification evidence; and (2) the ballistics expert testimony violated Bratcher's right of confrontation.

¶2      We reject Bratcher's arguments and conclude: (1) Bratcher failed to show that the lineup procedure was impermissibly suggestive; and (2) the State proved beyond a reasonable doubt that the admission of the ballistics expert testimony was harmless. Accordingly, we affirm his judgment of conviction.

## BACKGROUND

¶3      On July 13, 2019, City of Milwaukee police officers responded to a 911 call reporting that a child had been shot at the intersection of 42nd and Townsend Streets. At the scene, in the rear seat of an automobile, officers located a young child who had suffered a gunshot wound to her head. The child was later pronounced dead. Two adults and three other children were in the vehicle at the time of the shooting.

¶4      Amy,[1] the deceased child's mother, was identified as the driver of the vehicle at the time of the shooting. Amy had picked up her friend, Susan, and Susan's child shortly before the shooting. Susan's child was seated with Amy's three children in the back seat, with Susan in the passenger seat. As Amy pulled

---

[1] We use pseudonyms to refer to the victims in this case. *See* WIS. STAT. RULE 809.86 (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

away from Susan's house, Amy stopped abruptly to allow a black SUV to pass. The SUV had the word "Princess" written across the top of the windshield in large, cursive pink letters. The black SUV idled behind Amy's vehicle while Amy turned onto 42nd Street and began to drive northbound toward Fond du Lac Avenue. Susan heard a gunshot, turned and observed that the rear window of the automobile had been shattered, and the same black SUV with distinct lettering was following them. Susan also noted that one of Amy's children had slumped over in the back seat. Susan then observed the driver of the black SUV point a handgun toward Amy's vehicle, shooting twice more.

¶5 Officers later observed a vehicle matching the description of the black SUV and attempted to stop it, but the driver sped off. During the pursuit, the SUV crashed and was abandoned by the driver. From the vehicle, officers recovered a .45 caliber semi-automatic pistol, a pistol magazine loaded with .45 caliber cartridges, a single spent .45 caliber casing, and multiple documents and pieces of mail bearing the name "Antonio Bratcher." Investigators recovered a fingerprint from the pistol magazine, and the print was later identified as the fingerprint of Bratcher's left thumb. Investigators also recovered a palm print from the exterior of the driver's door, and this print was later identified as Bratcher's right palm print. At the scene, officers located two spent .45 caliber casings in the street where Amy's vehicle had been stopped.

¶6 Soon after locating the crashed vehicle, officers found Bratcher hiding under a front porch. Bratcher fled on foot and was taken into custody after a short pursuit. Two days after the shooting, Susan identified Bratcher as the shooter in a lineup.

¶7      Bratcher was charged with eight different felony counts, and the case was tried to a jury.  The State presented video from a Ring camera mounted outside the door of a residence associated with Bratcher.  The video showed Bratcher leaving the residence about an hour before the shooting with what appeared to be a large frame pistol butt hanging out of his right pants pocket.  In the video, Bratcher walked to a black SUV that drove away.  After his arrest, Bratcher was recorded in jail telling another individual that officers had a Ring video that "shows [Bratcher] walking out of the house with the pistol to the truck."

¶8      Susan testified that as they drove down 42nd Street, Susan heard a "pop, pop" and looked up to see a hole in the rear windshield.  Susan saw the driver of the SUV and a firearm, and she later heard one or two more shots.  Susan said she looked directly at the driver "because he was still shooting at us," and that she got a good look at his face.  She also remembered that the driver was wearing a black T-shirt.  Susan testified that she identified Bratcher as the shooter in a lineup at the police station.  She also made an in-court identification of Bratcher as the shooter.

¶9      Detective Jeffrey Sullivan testified that he responded to the shooting and located two .45 caliber casings at the scene.  Detective Sullivan further testified that he later responded to North 26th Street and saw that a black SUV with the word "Princess" in pink cursive lettering at the top of the windshield had crashed.  Inside the SUV, Detective Sullivan found a .45 caliber semiautomatic handgun with a cartridge in the chamber and a .45 caliber magazine with cartridges in it.  Detective Rodolfo Alvarado also testified that he and other officers processed the SUV for fingerprints and DNA.  Inside the SUV, officers recovered documents with Bratcher's name on them and a black baseball cap that was sent for forensic testing.

¶10    Detective Harold Thomas testified that he responded to the crash scene and spoke to a witness, who indicated the path of the person who fled the SUV. In examining that flight path, officers found a black T-shirt with what appeared to be wet blood on it inside a fenced-in area; the fence had been broken, and there was blood on several of the wooden fence slats near where the T-shirt was found. In the carport, officers found a belt and a blood-stained men's white undershirt. Blood samples were collected from the fence slats and the clothing items. Amber Rasmussen, a DNA analyst at the Wisconsin State Crime Laboratory, testified that she conducted the DNA analysis on the T-shirt, belt, baseball cap, and swabs from the wood fence, the handgun, the magazine, and the SUV's driver's door armrest. Rasmussen identified Bratcher as either the sole source or major source of the DNA on several of the items, including the T-shirt, the belt, the wood fence, and the armrest. Bratcher's DNA was also found on several swabs from the firearm.

¶11    Detectives William Schroeder and Lori Rom testified about the lineup procedure. Detective Schroeder sat with Susan during the lineup while Detective Rom ran the lineup.[2] Detective Schroeder testified that each participant in the lineup entered the room one at a time, and Detective Rom instructed each participant to make quarter turns before leaving the room. Detective Rom informed Susan that she had the option to ask and view the lineup a second time. Susan asked to view the lineup a second time before positively identifying Bratcher.

---

[2] Two other witnesses to the shooting also participated in the lineup. The first witness saw the shooting from her front yard, but she testified that she could not identify the shooter in the lineup. The second witness identified Bratcher in the lineup, but did not testify at trial. We therefore limit our discussion to the admissibility of Susan's testimony.

¶12     Detective Tyler Kirkvolv testified that he handled Bratcher and the fillers for the lineup with the goal "to have no one person standing out any more than another."  Detective Kirkvolv acknowledged differences among the lineup participants, including differences in facial hair, length of hair, and tattoos.  He also testified that witnesses viewing the lineup are told to disregard differences in hair style, facial hair, and other features that change.  The witnesses viewed the lineup participants from fifteen-to-twenty feet away.

¶13     Bratcher had some facial injuries, and the other fillers in the lineup did not, but the circuit court found that "it couldn't tell who had the injuries" when it viewed the lineup video, and it did not "note any injuries on [Bratcher]."  When it viewed a close-up photograph, the circuit court "had to look very carefully in the close-up to be able to determine" any injuries.

¶14     Xai Xiong, a firearms and tool mark examiner from the Wisconsin State Crime Laboratory, provided the ballistics testimony at trial.  Xiong did not author the original ballistics report, nor did he fire the pistol to create cartridges used to compare against the cartridges recovered by police.  Instead, Xiong performed "peer review and verification" through use of a comparison microscope, comparing the cartridges created by the original analyst against the cartridges recovered by police.  Xiong testified that it was his opinion that the two cartridges recovered from the scene were fired from the .45 caliber pistol recovered from the black SUV.  Xiong added nothing to the original report except his conclusion that he would have reached the same result.

¶15     The jury found Bratcher guilty of all eight counts, and the circuit court sentenced him to a total of thirty-six years of initial confinement and twenty-two years of extended supervision.  Bratcher appeals.

**DISCUSSION**

**I.      The lineup was not impermissibly suggestive.**

¶16     Bratcher brought a pretrial motion to suppress the lineup identification evidence, arguing that the lineup was impermissibly suggestive. The circuit court denied the motion, and this evidence was admitted at trial.

¶17     We apply a two-step standard of review when analyzing a motion to suppress. *State v. Roberson*, 2019 WI 102, ¶66, 389 Wis. 2d 190, 935 N.W.2d 813. First, we will uphold the circuit court's findings of fact unless they are clearly erroneous. *Id.* Second, we independently apply the "constitutional principles to the facts found, which presents a question of law." *Id.*

¶18     A defendant's due process rights are implicated when an out-of-court identification procedure is "both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012). The likelihood of misidentification violates a defendant's right to due process. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). That being said, reliability remains the "linchpin in determining the admissibility of identification testimony." *Roberson*, 389 Wis. 2d 190, ¶3 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). Therefore, a court may admit an out-of-court identification based on an impermissibly suggestive identification procedure if the out-of-court identification was reliable under the totality of the circumstances. *Biggers*, 409 U.S. at 198-200.

¶19     Wisconsin courts apply a two-part test for determining whether to admit an out-of-court identification. *Roberson*, 389 Wis. 2d 190, ¶34. First, "the defendant must meet an initial burden of showing that the identification procedure employed by law enforcement was impermissibly suggestive such that there was a

very substantial likelihood of misidentification." *Id.* Second, if the defendant meets their burden, then the State must prove that the identification was nonetheless reliable under the totality of the circumstances. *Id.*, ¶35.

¶20 Bratcher argues that the lineup procedure was impermissibly suggestive because: (1) the police allowed Susan to view the lineup a second time contrary to internal operating procedures, and (2) the fillers in the lineup did not closely resemble Bratcher. We reject Bratcher's arguments and address each of them in turn.

¶21 First, we address Bratcher's argument that the lineup procedure failed to follow Milwaukee Police Department ("MPD") and Attorney General ("AG") lineup guidelines because Susan was allowed to view the lineup twice. As a threshold matter, and as Bratcher acknowledges, MPD procedures and AG opinions are not binding on Wisconsin courts. Moreover, the facts demonstrate that the lineup challenged in this case complies with both the MPD procedures and AG opinions cited by Bratcher.

¶22 The MPD procedure states: "Only upon request of the witness may the witness view the subjects again after the lineup has been completed. If this occurs, it must be thoroughly documented, and the entire lineup shall be viewed by the witness following the above procedures. The administrator should never suggest additional viewing." The AG opinion states:

> The practice of conducting multiple identification procedures with the same witness and the same suspect should ordinarily be avoided because of the potential for suggestiveness and the potential to contaminate a witness's memory. An eyewitness viewing a second procedure with the same suspect may believe that the suspect's presence in both procedures suggests that authorities believe the suspect is the perpetrator.

¶23    Detective Rom did not suggest a second viewing of the lineup contrary to MPD policy. Rather, she informed Susan that she had the option to ask and view the lineup a second time. Additionally, there was no risk that viewing the same lineup a second time would suggest that Bratcher was the perpetrator contrary to the AG opinion because the lineup was the same. That is, Bratcher and all the same fillers, in the same order, were viewed a second time, so there is no possibility that Susan would have been influenced by Bratcher appearing in both viewings where all the fillers also appeared twice.

¶24    Second, Bratcher asserts the fillers in the lineup were impermissibly suggestive because they did not closely resemble Bratcher or bear distinct facial scars that Bratcher had. We agree with the circuit court that any difference in appearance between Bratcher and the fillers is insignificant. Although there were differences in facial hair and hair length, Susan was instructed to disregard these and other easily modified characteristics. Moreover, the circuit court found that Bratcher's facial scars were unnoticeable in a close-up photograph, let alone from the witness's position of 15-20 feet away. These findings are not clearly erroneous. *Roberson*, 389 Wis. 2d 190, ¶66.

¶25    Accordingly, we conclude that the lineup was not impermissibly suggestive, and the circuit court did not err by admitting Susan's testimony regarding her positive identification of Bratcher in the lineup.

## II.    The admission of Xiong's testimony was harmless.

¶26    Bratcher argues that the circuit court erroneously admitted Xiong's ballistics expert testimony. Specifically, Bratcher claims that the admission of Xiong's testimony violated his constitutional right of confrontation because the State failed to produce the analyst that authored the ballistics report and fired the

gun to create the comparison cartridge. Bratcher relies on *Smith v. Arizona*, 602 U.S. 779 (2024), which was issued after Bratcher's trial. However, Bratcher's assertion that Xiong's testimony was unconstitutionally admitted at trial is subject to harmless error analysis, and we conclude that the admission of Xiong's testimony was harmless beyond a reasonable doubt. Accordingly, we do not discuss the applicability of *Smith*. *See State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("[C]ases should be decided on the narrowest possible ground[.]").

¶27     For an error to be harmless, the party benefiting from it (here, the State) must demonstrate that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *State v. Harvey*, 2002 WI 93, ¶49, 254 Wis. 2d 442, 647 N.W.2d 189 (citation omitted). While "harmless error is not subject to a precise mathematical formula," *State v. Monahan*, 2018 WI 80, ¶63, 383 Wis. 2d 100, 913 N.W.2d 894, multiple non-exhaustive factors may assist the analysis, including: the importance of the erroneously admitted evidence, the presence or absence of evidence corroborating or contradicting the erroneously admitted evidence, the nature and strength of the defense, and the nature and strength of the State's case, *State v. Hunt*, 2014 WI 102, ¶27, 360 Wis. 2d 576, 851 N.W.2d 434. Whether an error was harmless is a question of law we review independently. *State v. Beamon*, 2011 WI App 131, ¶7, 336 Wis. 2d 438, 804 N.W.2d 706.

¶28     We conclude that the State proved beyond a reasonable doubt that the admission of Xiong's testimony was harmless. As summarized above, the evidence of Bratcher's guilt was overwhelming, as was the other evidence linking the pistol to the SUV and the SUV to Bratcher. This evidence includes: Bratcher's DNA found in the SUV and on the pistol; Bratcher's name on documents in the

SUV; the easily-identifiable nature of "Princess" written in pink, cursive letters across the top of the SUV's windshield; the video of Bratcher carrying a pistol while getting into the SUV; Susan's in-court and out-of-court identifications; and the inculpatory recorded jail call. Given this evidence, it is "clear beyond a reasonable doubt that a rational jury would have found [Bratcher] guilty absent the error." *See Harvey*, 254 Wis. 2d 442, ¶49 (citation omitted).

## CONCLUSION

¶29 We conclude that the lineup identification evidence admitted at trial was not impermissibly suggestive. Additionally, assuming without deciding that the ballistics testimony should have been excluded from trial, we conclude that this alleged error was harmless beyond a reasonable doubt.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

11